## 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 ℭ𝔬𝔲𝔯𝔱—𝔊𝔢𝔫𝔢𝔯𝔞𝔩 𝔗𝔢𝔯𝔪—𝔉𝔦𝔯𝔰𝔱 𝔇𝔢𝔭𝔞𝔯𝔱𝔪𝔢𝔫𝔱.

*October*, 1885.

## PEOPLE *v.* CHACON.

### MURDER.—EVIDENCE.—CONFESSION.

Voluntary statements made by defendant as to the offense with which he is charged, made to the officers having him in custody, on his arrest therefor, are admissible against him.*

Where a witness proceeds to answer a question in a manner not responsive thereto, counsel must at once object as soon as it is apparent that the answer is irresponsive. He cannot lie by until the witness has finished his answer and then move to strike it out. (Per DANIELS., J)

Where an improper answer has been received without objection, it is not error to refuse to strike out the same answer when made subsequently to another question.

A witness, asked whether he had heard defendant make any threats against deceased, answered: "Not in my presence." *Held*, sufficiently responsive to the question, being in effect a statement that witness had not himself heard such threats.

A question, "If Maria Williams had been in her room at the time of the shooting, would not you have seen her there?" is proper, as calling for a fact, the result of the observation and attention of the witness, and not a conclusion.

APPEAL by defendant Miguel Chacon, from a judgment of the Court of General Sessions of New York of November 25, 1884, Hon. FREDERICK SMYTH, Recorder, presiding, convicting him of murder in the first degree, and from an order denying him a new trial.

The defendant, Miguel Chacon, in November, 1883, began to live with one Maria Williams, the victim of the murder, in the absence of her husband, at No. 128 West Twenty-seventh street, in the city of New York. The husband of Maria Williams returned to New York in January, 1884,

---

* See People *v.* McGloin, 1 *N. Y. Crim. Rep.* 105, 154.

but did not call to see his wife until the latter part of April. He saw her, also; several times in the month of May, and in the month of June began living with her again, paying the rent of a floor on the fourth story of the premises No. 128 West Twenty-seventh street.

On the morning of June 20, 1884, Munro Williams, the husband of Maria Williams, arrived in New York from Hartford, where he had been since the 17th, and on going to his rooms in said house perceived the defendant sitting by the window in the kitchen. Chacon then went out, but came in again when Munro Williams was eating his breakfast. Chacon having again gone out, Williams did not see him again until about ten or eleven o'clock of the same day, when he came into the hall, and called Maria Williams out. Williams went out after his wife, and Chacon, then proposing to sell him his furniture, which he had left in the rooms, Williams bought it for four dollars and a half, which he paid to Chacon. Chacon then went away. At about half-past seven or eight o'clock in the evening, Williams, returning, found him again in his kitchen in conversation with his wife and one Hattie Brown. Having asked for his clothing, Maria Williams put it in a bundle on the table. Chacon snatched the bundle, tore it open, and asked for a pair of socks. A man by the name of Albert Washington coming in, Chacon sent him out for a pint of beer, which was drunk by Chacon, Washington, Williams and his wife. Williams then said to his wife, " it is time we were getting to bed." Thereupon Chacon took a glass from the table, and carrying it into an adjoining room, gave it to one Rosie Harris. Coming back to the kitchen, he took up three other glasses which were on the table, broke them and chucked them into an ash can, with a little bottle of tooth-powder. A wrangle with Maria Williams then ensued, during which Chacon picked up a horse-shoe pin, saying it was his. Maria Williams grabbed it, whereupon Williams himself stepped up and said : " Take this and everything you have got in this house and get out of this house, I want no trouble with you." Chacon then packed up his bundle and went out. Williams heard him go down. The time was then between half-past nine and ten.

A few minutes after, Williams and his wife started out of the kitchen for their bedroom, and opening the hall door Williams saw Chacon standing in the hall at the head of the stairs. Williams came up near to where Chacon stood, but at his wife's request went back and locked the kitchen door. Meanwhile his wife, passing Chacon, went down the hall to the bed-room door. That was about forty-seven feet from where Chacon was standing. As she passed, Williams heard Chacon say something to her in broken English, which he did not understand. Having locked the kitchen door, Williams also went by Chacon, and arrived at the bed-room door beside his wife. Chacon had nothing in his hand so far as Williams saw. As Williams was bending down to put the key in the lock in the bed-room door, Chacon drew a pistol and fired the first shot. Mrs. Williams was then facing Chacon, while Williams had his right side exposed to him. Hearing the first shot, Williams turned his head in time to see the flash from the second one. He then discovered that Chacon had advanced to a point not more than fifteen or seventeen feet away. The ball passed over Williams' head and buried itself in the sill of the door. By that time Williams had opened the door, and had thrown his arms about his wife in an effort to drag her into the room. While attempting that, Chacon fired the third and fatal shot, which entered the left breast of Maria Williams and passed through the heart. She came into the room, and walking across it, set the lamp, which she was carrying, in the window, and going back to Williams by the door, exclaimed, ".My God ! my God ! I am shot," and threw up her arms and died.

Immediately after firing the fatal shot the defendant disappeared. Officer Price, being summoned, went in pursuit of him, and found him on the roof of No. 70 Spring street, behind a chimney, at about 1 o'clock on the morning of the next day. In the pocket of the defendant's pantaloons, Officer Price found the pistol, within which were three empty shells and three loaded ones. From the prisoner's testimony it appeared that he purchased the pistol and cartridges on the day before in Carmine street, and that it was a self-cocking pistol.

It was proved by the witness, Annie Stewart, who lived on the third floor, that about twenty minutes to seven, on the night

of the shooting, she saw the defendant stop under the gas-lamp, fix a revolver which he had in his hand, put it behind in his pocket, and then go upstairs in the premises where the affray occurred. She also heard the shots and saw the defendant come down after the shooting, with the pistol in his hand.

By the witness Hattie Brown, it was proved that about a week before the shooting, she saw Chacon and Maria Williams quarreling in the hall on the fourth floor of the premises in question, and that on looking out, she saw Chacon with a pistol in his hand. On another occasion, in May, he came into his room opposite to the room of the witness, with a pistol in his hand, and while cleaning it, said : " I bought this pistol to kill Maria with." The witness then said, " Chacon, that is not a thing for you to be playing with, you had better put it away." He said, " I don't fool, I know what I am doing."

Another witness, James H. Johnson, who, in February, 1884, lived on the fourth-floor flat, with Chacon and Maria Williams, deposed that one evening in that month, he was sitting at the table with them eating dinner. Maria then said, " I heard from Williams ; he expects to come back." Chacon in reply said, " If Williams comes back, I can't live with you. I will kill you and Williams." She said to him, " Then if you do you will get hung for it." He said, " I will kill myself before I get hung." And in conclusion, it appeared that when arrested by Officer Price, and being informed that Maria Williams was dead, he told the Officer that he shot her because she failed to keep her promise to live with him.

The defendant, after calling several witnesses as to his character, took the stand himself, and attempted to justify the shooting on the claim that Williams had assaulted him with a knife just before the shooting occurred ; that he shot at Williams in self defense, and that the killing of Maria Williams was accidental, the defendant having no ill-will against her, but, on the contrary, loving her. The defendant also denied all the testimony as to both threats or confession which had been introduced by the prosecution.

There was some evidence also, that the first two shots were fired at Williams and not at his wife. The rebuttal evidence of the prosecution, however, contradicted the defend-

ant's testimony as to the assault, which he alleges Williams made upon him, and from which, as he deposed, he attempted to defend himself. In particular, the witness, Hattie Brown, who had a door opening on the hall near the place of the alleged assault, although her door was open at the time, heard none of the noise, talk, conversation or epithets, which the defendant attributed to Williams on the occasion.

The part of the cross-examination of Munro Williams, the husband of the murdered woman, a witness for the prosecution, referred to in the opinions of the General Term, is as follows:

Q. Have you any other reason to say that the third shot was fired at your wife, except you moved your position? A. No, sir; the second shot was fired as I was getting in the door, and the third shot ·was fired after I got in the door and this hand on her left shoulder. Q. Have you any other reason for saying to the jury, that that last shot was fired at your wife, except you got a little out of the way? A. No reason more than he had threatened to kill her, and that was his only opportunity. Q. I want to know now, sir, if you have any other reason for basing it upon—anything that the prisoner at the bar did on that occasion, for saying that last shot was fired at your wife, except that you got a little out of the way?

*Counsel.*—I move to strike that out. The Court.—Strike out the answer. He is asking you now to keep down to the time the third shot was fired; he wants to know if anything was said? A. No, sir. Q. There was nothing said from which you would base any reason for his shooting your wife? A. No, sir. *Counsel.*—Q. Now, sir, did you ever hear this man make a threat against your wife? A. Not in my presence.

*Counsel.*—I move that it all be stricken out, about these threats.

The Court.—Q. Did you ever hear him make any threats against your wife? A. No, sir; not in my presence. The Court.—Let it be stricken out.

*Counsel.*—Q. Now, I again ask you this: you have testified to this jury that the first two shots were fired at you? A. Yes, sir. Q. Now, sir, can you give to this jury any reason why they were fired at you? I ask, of your own knowledge, can you

give us any reason, aside from the fact that you had stepped one side, for telling us that he fired the last shot at your wife—yes, or no? A. The only reasons I could give, is, that he has threatened to take the life, and that was his only opportunity, and he fired at her.

*Counsel.*—I move to strike out that answer.

*District Attorney.*—I will consent. THE COURT.—I will allow it to stand. *Counsel.*—I take an exception.

Q. I again ask you if you ever heard him make any such threat? A. Not in my presence. *Counsel.*—I move to strike out the evidence as to the threat. THE COURT.—I deny it. *Counsel.*—I except to that ruling. Q. Now, sir, how far had you stepped one side at the time the third shot was delivered? A. I just stepped about half a foot, just the length of my arm, which reached across her breast. Q. Up to the time that third shot was delivered, had anything been said? A. No, sir. Q. Do you know what I mean by personal knowledge? A. I could not say. Q. I mean something you saw, or you yourself have heard. Do you understand it now? A. Yes, sir. Q. Now, I want to know how far you had stepped one side, and just about precisely what you were doing at the time that third shot was fired? A. I had one hand on the door-knob, and the left on her shoulder, taking her into the room; I says to her, "for God's sake, get out of the way." By THE COURT.—Q. How far had you got inside? I just made one step inside the door. By *Counsel.*—Q. Now, sir, did he go away after this last shot was fired? A. Yes, sir.

*Counsel.*—I again move to strike out that answer about the threats. THE COURT.—I denied it already; I am not in the habit of overruling myself. *Counsel.*—I take another exception.

*Chas. S. Spencer*, for defendant, appellant.

*Randolph B. Martine*, district attorney (*De Lancey Nicoll*, assistant), for the people, respondent.

DANIELS, J.—The defendant was indicted for the crime of murder in the first degree, in taking the life of Maria Williams,

by means of a pistol in his possession, and discharged by him, which inflicted a mortal wound upon her of which she soon afterwards died. The proof was such as to leave no doubt that the pistol was so discharged, and that her death was caused by the wound which the defendant thereby inflicted. The important and controverted subject was, whether her death was caused with that degree of premeditation and deliberation which has been required by section 183 of the Penal Code, to create the crime of murder in the first degree. The evidence, however, was such as to render that inquiry strictly an appropriate one for the decision of the jury, and it was submitted to them by a very clear and impartial charge by the Recorder, who presided at the trial. As to the rules of law required to be observed for the decision of the case, there is no reason for supposing that the jury could by any possibility have been involved in the least misunderstanding. Before the charge was delivered, certain requests were presented by the learned counsel representing the prisoner, which the court in terms declined to submit to the jury. But no error can be predicated of such refusals, for in the charge itself great care was taken to define the law as the jury were required to observe it. And that fully and clearly presented the case to them, within the limits of the evidence taken upon the trial. After the jury had devoted several hours to the consideration of the case, they returned into court, and presented a further inquiry to the Recorder concerning the legal requirements to create the crime of murder in the first degree, and they were fully answered by reading or stating to the jury, what had previously been said upon this subject by Mr. Justice DAVIS, presiding over the trial of Walworth, and by the courts upon careful and mature deliberation, as to the signification of the language employed in the statute. There was no room for any misapprehension on the part of the jury, and they are to be presumed to have disposed of the case from a careful examination of the evidence and as that warranted its disposition.

It has, however, been further urged that evidence was improperly received against the defendant in the course of the trial. This in part consisted of his own statements, made first to the officer by whom he was arrested, and afterwards to the

police sergeant before whom he was taken. But neither of these statements was induced by means of any threat made to the defendant, or any promise, or intimation that he could by any possibility be benefited by making a confession. He was, on the contrary, warned by the officer who arrested him, that whatever he might say would be used against him, but that he was at liberty to speak about the occurrence, if he wanted to do so, and under the impression produced by that information and his own inclination to speak, the statements were made, which were used against him upon the trial. The only circumstance, therefore, upon which the statements could be resisted, or objected to, as evidence, was the fact that he was in the custody of an officer when these statements were made. And that, it has been settled, before the enactment of the Code of Criminal Procedure, would not be sufficient to justify the court in excluding the evidence of his statements. The rule, on the other hand, is, that all he may have said which was in any manner relevant to the inquiries required to be made upon the trial, was admissible as evidence against him. Hendrickson v. People, 10 *N. Y.* 13, 21; People v. Rogers, 18 *N. Y.* 9; Teachout v. People, 41 *N. Y.* 7.

And by section 395 of the Code of Criminal Procedure it has been enacted that, "a confession of a defendant, whether in the course of judicial·proceedings, or to a private person, can be given in evidence against him unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney that he shall not be prosecuted therefor." Under this provision, as well as the preceding rule of evidence, the statements made by the defendant concerning the fact of his commission of the homicide were legal evidence against him.

In the course of the cross-examination of the witness Williams, who was the husband of the deceased woman, he was repeatedly asked whether he had any other reason for saying that the third shot was fired at his wife except that he himself moved in his position. The witness was finally required to answer this question yes, or no, but he failed to do that, and his answer was that: "The only reasons I could give is that he has threatened to take the life, and that was his only opportun-

ity, and he fired at her." This answer was not responsive to the question put to the witness, or within the limits to which he had been subjected for giving his answer. And the counsel thereupon moved to strike it out, but without particularly bringing this objection to the notice of the court, and it was allowed to stand, to which the counsel then took an exception. But it was entirely evident, from the manner in which the witness proceeded to give his answer to this final question, that he was not about to answer the question by a yes, or no. That was at once observable by the manner in which he commenced to answer the question, and if the counsel still designed to restrict him to a categorical answer, he should at once have interposed to arrest the answer which the witness was in the act of giving, and which was clearly not of that description. But he failed to do that, and permitted the witness to go on with the answer in a different form, and strictly not within the question which had been propounded, and it was only after the answer had in this manner been completed that the application was made to strike it out. This the counsel had no right to do. As the witness was evidently not disposed to answer the question in the manner in which the counsel had propounded it, he should at once, when that became evident, have interposed his objection, as he well might, for he had a sufficient opportunity to do so, and prevented the witness from answering as he was inclined to answer, and which he may have done from a misapprehension of the question itself. He could not sit quietly by and allow the witness to answer the question in a different manner from that which he had been required to observe, and then, when the answer proved to be unsatisfactory, move to strike out the evidence. This was considered in Quin v. Lloyd, 41 N. Y. 349, where it was said by Woodruff, J., that, " A party, against whom a witness is called and examined, cannot lie by and speculate on the chances, first learning what the witness testifies, and then, when he finds the testimony unsatisfactory, objecting either to the competency of the witness, or to the form or substance of the testimony." Id. 355. By taking this course, which seems to have been followed at the trial, the counsel deprived himself of the right to move to strike out the evidence. Beyond that, the answer in no manner could

have prejudiced the defendant, for before it was given the witness had stated the same thing, and if this particular answer had been stricken out, it would not have relieved the case from the statement. In both instances, the motion made by the counsel was to strike out this particular answer, and no other, while before the question was propounded to which the answer was made, the same statement had been made by the witness. That statement preceded all controversy between the counsel and the witness, and all effort on the part of the former to so shape the answer as to obtain a more categorical reply. In the uninterrupted course of the cross-examination, the counsel had before asked the witness this question: " Have you any other reason for saying to the jury that that last shot was fired at your wife, except you got a little out of the way ?" " No reason, more than he had threatened to kill her, and that was his only opportunity." There was no motion at any time to strike out this answer, but the question was again substantially repeated, and the answer then given by the witness was not inserted in the case, but it was stricken out by the court. A further examination of the witness followed, in which the answer finally moved to be stricken out was given. Striking it out under these circumstances would have been no benefit whatever to the defendant, for the first answer, including the statement of this threat, would still have remained in the case to be considered and acted upon by the jury.

After the motion to strike out the final answer was denied, the witness was further asked whether he had ever heard the defendant make any such threat, and his answer was, " not in my presence." He had previously twice answered in the same manner, and his answers on the application of the defendant's counsel were stricken out, but this third answer was retained by the court and the defendant excepted to the ruling by which it was permitted to stand. This answer was a qualified response to the question which was put to the witness, not strictly responsive, but sufficiently so to entitle the court to retain it. But if that was not so, retaining it in the case could not in any manner have prejudiced the defendant. It was rather a benefit to him, for, to a certain extent, it tended to impair the weight of the statement made that the defendant had threat-

ened to kill this woman. For if the threat was not made in the presence of the witness it might well be argued to the jury and considered by them, that the witness had not been stating the fact according to his own knowledge, and therefore his statement of the threat would be unreliable. To have stricken out this answer would have deprived the defendant of the benefit of this argument, and that the court was not required to do, even though the application for it was made by his own counsel. No further examination was made of the witness. He was not asked to state how he was able to say that the defendant had threatened to kill his wife, as long as the threat was not made in his presence, or when, or under what circumstances it was made; but the counsel voluntarily left the case in this position without endeavoring to clear it up, either for the benefit, or at the risk of the defendant. That may have been the most judicious course, to be adopted, inasmuch as the answer finally received had some tendency to render it probable that the witness at no time heard the defendant threaten to take the life of his wife.

A witness was asked by a juror, " If Maria Williams had been in her room at the time of the shooting, would not you have seen her there?" The answer was, " Certainly." The defendant's counsel moved to strike this answer out. The court refused, and an exception on behalf of the defendant was taken. This witness was asked for no matter of judgment or opinion, but as to a strict matter of fact, whether she would or would not have seen Maria Williams if she had been in her room at the time of the shooting. It was a question to be answered as the result of observation and of the attention of the witness to what at the time was transpiring and whether Maria Williams was then present or not. It was an inquiry as to her ability to answer, and to answer with certainty, and the response given by her was entitled to be retained to be considered by the jury in the weight they might regard her testimony as deserving.

The evidence was such as very clearly to warrant the jury in concluding that the defendant had taken the life of the deceased woman with a deliberate and premeditated design to cause her death. Their verdict, consequently, being so sus-

tained, could not legally be interfered with by the court. No point has been presented upon which can be determined that the disposition made of the case at the trial was in any respect different from what it should legally have been.

The judgment, as well as the order denying the motion for a new trial, should be affirmed.

DAVIS, P. J.—I concur in the conclusion of my brother DANIELS that the conviction and judgment should be affirmed. The only question in the case upon which any doubt can arise seems to me to be the one so elaborately discussed by my brother BRADY. I think the court ought to have granted the motion to strike out the answer to the question which called for a simple "yes or no." But taking all that was said by the witness bearing upon the question whether he had heard any threats against the life of the deceased made by the defendant, it seems to me no doubt can exist that the jury fully understood from the witness, that he had heard none himself. They could not have taken his testimony as asserting that the reason the witness had for saying that the third shot was aimed at his wife, was that he the witness had heard the defendant make threats against her life. On the contrary, they must have understood him as meaning to say that the reason he thought the shot was aimed at her was because he had heard or understood that defendant had threatened her life. An answer in that form to a question asking for his reason for stating that the shot was made at the deceased would not have been objectionable. It would have been advantageous to the prisoner, because it would have taken out of the former answer all idea that the reason was based upon any actual knowledge of threats.

Permitting the answer to stand, taking the whole testimony of the witness on that subject into consideration, could not have had any effect prejudicial to the defendant. Threats were proved by other witnesses. The shot, which was the immediate subject of inquiry, was shown to have caused the death of the deceased. That it was, in fact, aimed at her was physically proved by the fact that the bullet penetrated her breast and heart and caused instant death. The answer of the witness, that it was intended for her rather than himself, was the expression of his opinion upon a reason not based upon knowl-

edge, but on hearsay. And the jury could not have been mis-
led, in considering that reason, by the idea that witness was testi-
fying to any actual knowledge of threats. It would have been
better to have stricken out the answer; but it is not apparent
that it did any possible injury to the defendant. The evidence
against him was sufficient to justify the verdict, wholly inde-
pendently of this particular answer, and we are not at liberty,
I think, to assume that the jury took the testimony of this wit-
ness for anything more than its legal value under the circum-
stances of his own explanations.

I think, for these reasons, the judgment should not be dis-
turbed.

BRADY, J.—[Dissenting.]—The facts and circumstances
established by the evidence, seem to have warranted the con-
viction of the appellant of the crime of which he was charged,
showing as they did, beyond reasonable doubt, the existence of
premeditation and deliberation. For the purposes of this
appeal, it is not necessary, however, to go into the details of the
charge and proof; a general statement will suffice.

It appeared that during the absence of the husband of Mrs.
Williams, the appellant had established intimate relations with
her, which, by the husband's return to his wife, were inter-
rupted, to the great displeasure of the appellant, who exhibited
his anger and resentment on different occasions. On the night
when he shot the deceased, he was in the apartment occupied
by Mrs. Williams and her husband, and was excited and violent
in his conduct there, and left only when they announced their
intention to retire for the night. He did not go out of the
house, however, but went into the hallway from which they
entered their bed-room, and stood there about forty-seven feet
from the door of the bed-room. The killing took place at that
door, and the husband was present, therefore, when it was done,
and was called as a witness upon the trial. His statement of
the occurrence was substantially, that his right side was exposed
to the appellant whilst he was bending over in order to put the
key in the lock, and that his wife stood facing the appellant
when the first shot was fired. He heard the shot, and turning
his head in the direction of it, saw the flash from the second

shot, and then discovered that the appellant had advanced to a point not more than fifteen or seventeen feet away from himself and his wife. The ball from the second shot passed over his head and buried itself in the sill of the door. At the time the second shot was fired, he had opened the door, and was endeavoring to drag his wife into the room, when the third shot was fired, and the bullet which was projected by it, entered her left breast, passing through her heart and producing death instantly. His conviction was that the appellant fired the last shot at Mrs. Williams, and doubtless to test the accuracy of the statement of the witness in this respect, and to assail the charge made by the indictment, the counsel for the appellant was desirous of establishing the fact that the shot was designed for Mr. Williams, the witness, and not for his wife, and therefore asked the following question : " Have you any other reason for saying to the jury that the last shot was fired at your wife, except that you got a little out of the way ? " And he replied : "No reason, more than he had threatened to kill her, and that was his only opportunity." This answer, on the application of the appellant's counsel, was stricken out, and the witness was then asked whether he had heard the appellant make any threat against his wife, both by the counsel for the appellant and by the court ; and he said in answer : " No, sir, not in my presence." And then, in response to a motion that all the witness had said about threats should be stricken out, it was stricken out, apparently for the second time.

The counsel for the appellant persisted, it would seem, not satisfied to allow the matter to rest as it then appeared upon the record, and asked the further question, " Now, sir, can you give to this jury any reason why they fired at you ? I ask of your own knowledge, can you give any reason, aside from the fact that you had stepped one side, for telling us that he fired that last shot at your wife—yes or no ? " To which the answer was made, " The only reason I could give is that he has threatened to take the life, and that was his only opportunity, and he fired at her." Whereupon the counsel moved to strike out that answer. But the court allowed it to remain, notwithstanding the district attorney was willing it should be stricken out, and the counsel for the appellant thereupon excepted.

The witness was immediately asked, after this incident, if he had ever heard the appellant make any such threat. To which he answered, " Not in my presence." The counsel for the appellant then renewed his motion to strike out the answer as to the threat. The application was, however, denied, and an exception duly taken.

When a witness is asked generally to give his reasons for any circumstance which he relates, or any fact which he states, or any conclusion which he draws, however illogical the answer may be, and, indeed, whatever may be its character, it must be accepted and all its consequences assumed. But the question asked the witness was not in that form. He was not asked to give the reason of his own knowledge for telling the court and jury that the last shot was fired at Mrs. Williams, but whether he could give a reason, and to answer yes or no. And this question was regarded by the court, it seems, as one calling for a statement of his reason. His answer was not the one called for, nevertheless. He was asked to state whether he could give a reason, but not for the reason, and yet he proceeded to give one which was not predicated of anything within his own knowledge but upon information given, on the truth of which he believed. This was entirely outside of the question, and his answer, considered abstractly with reference to his knowledge, was substantially that he could give no reason. If he were allowed to state his reason under the question, the answer should have been based upon knowledge—not belief, or rejected. As given, it related to a very important element in the case, namely, premeditation and deliberation, the presence of which was necessary to establish the crime of murder in the first degree, and one which the learned Recorder in his charge did not fail to consider and descant upon. The effect of the last ruling, it must be observed, was to restore the statement of the witness as to threats against the life of his wife which had been previously stricken out, and to leave it for the consideration of the jury. It is impossible to avoid this conclusion, inasmuch as the reason given was, that the appellant had threatened to take her life and therefore shot at her. In other words, the witness was allowed to say, " I know the appellant shot at my wife, because he threatened to kill her, and this was his oppor-

tunity," and this although he did not know that such a threat had been made. It is equally impossible to say that this had no effect upon the jury, or that it was immaterial. It certainly was not a technical error. Indeed, it was one upon a very important subject, bearing, as it did, upon the question of pre-meditation and deliberation. The statement by the witness was one in addition to those of other witnesses of a similar import, who had heard the threats expressed, and gave, therefore, corroboration to what they said on that subject.

If this court was entirely satisfied that the effect of the ruling considered could by no possibility be injurious to the rights of the prisoner, it would not hesitate to disregard the exception, for the reason that that result would bring it within the adjudicated cases. But it is impossible to say it did him no injury. And it becomes necessary, therefore, to order a new trial, which is done reluctantly, for, as already stated, the evidence seems to have fully warranted the conviction of the appellant.

Judgment affirmed.