Confessions and statements, made by persons charged with crime, have been very differently regarded by the civil and the common law. The former, reposing with confidence upon the assumption that one who is innocent will never admit that which tends to show guilt, treats the declarations and admissions of the accused as evidence of the most satisfactory kind. To such an extent does it carry this idea, that in all except capital cases a confession by the accused is deemed conclusive evidence of guilt, unless met by overwhelming proof to the contrary. (Domat's Civil Law, § 2086, Cushing's ed.)
The common law, on the other hand, with, as I think, a truer philosophy and better appreciation of the nature and operations of mind, regards this species of evidence with distrust. It carefully scrutinizes the circumstances, and rejects the evidence if it sees that no safe inferences can be drawn from it. The first distinction which it makes is between a declaration or statement made before, and one made after, the accused was conscious of being charged with or suspected of the crime. If before, it is admissible in all cases, whether made under oath or without oath, upon a judicial proceeding or otherwise; but if made afterwards, the law becomes at once cautious and hesitating; the inquiry then is, was it voluntary? For unless entirely voluntary, it is held not to be admissible.
In order to apply this rule it is necessary to know what is meant by the term voluntary. The word is evidently not in all cases used in contradistinction to compulsory; because *Page 386 
a confession obtained by either threats or promises, from any one having authority over the accused or concerned in the administration of justice, is uniformly held to be inadmissible. However slight the threat or small the inducement thus held out, the statement will be excluded as not voluntary. It is plain therefore that, in such cases at least, by voluntary is meant, proceeding from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause.
The principle upon which this rule is based is obvious. It is, that we cannot safely judge of the relation between the motives and the declarations of the accused, when to the natural agitation consequent upon being charged with crime is superadded the disturbance produced by hopes or fears artificially excited. It is because it is in its nature unreliable, and not on account of any impropriety in the manner of obtaining it, that the evidence is excluded. In this all the authorities agree. Mr. PHILLIPS, speaking on this subject, says: "A confession so obtained cannot be received, on account of the uncertainty and doubt whether the prisoner might not have been induced, from motives of fear or interest, to make an untrue statement."
The case of Rex v. Warickshall (1 Leach C.C., 263) affords a strong test of this doctrine. The prisoner had made a confession which was held to be inadmissible; but this confession had led to the discovery of other facts sufficient to convict. Her counsel contended that, the confession being inadmissible, facts discovered by means of it must be equally so; and if the confession was excluded, not as unreliable, but as having been improperly obtained, or on account of any supposed violation of public faith, as was there contended, the argument would have been unanswerable. The evidence, however, was received, and the court say: "Confessions are received in evidence or rejected as inadmissible, under a consideration whether they are or are notentitled to credit." (See also Rex v. Butcher, note to *Page 387 Warickshall's case; Rex v. Lockhart, 1 Leach C.C., 386;Regina v. Gould, 9 Car. Pa., 364.)
The doctrine of the American courts is the same. In the case ofCommonwealth v. Knapp (9 Pick., 496), MORTON, J., speaking of the grounds upon which the statements of prisoners are excluded as not voluntary, after remarking that it is not because their admission would be a breach of good faith, nor because they have been illegally extorted, says: "but the reason is that, in the agitation of mind in which the party charged is supposed to be, he is liable to be influenced by the hope of advantage or fear of injury to state things which are not true."
It scarcely needed this array of authority to prove that all extrajudicial statements and confessions of an accused party, when not regarded as voluntary, are excluded because they cannot be relied upon as evidence of guilt, and for no other reason. Nodictum to the contrary can be found. Now, the inquiry I would make is this: Are such statements, when made in the course of some judicial proceeding, rejected on totally different grounds? The supposition that they are has given rise to all the difficulty which exists on this subject.
It will be seen that the words used to test their admissibility are the same in both cases: was the statement voluntary? This is the inquiry, as well when it was made upon a judicial examination, as when it was not. If made under oath, by the party charged, upon a judicial inquiry as to the crime, it is rejected as not being voluntary. The use of the word voluntary in this connection, has suggested the idea that it is the compulsory nature of the oath, which prevents the statement from being received; and hence, that its rejection is based, not upon the uncertain nature of the evidence, but upon a supposed violation of that principle of the common law which is embodied in the maxim, nemo tenetur accusare se ipsum. But the law, I apprehend, is not so wanting in that precision of language which is essential to *Page 388 
every science, as to use the same word in relation to the same subject in two such different senses. This question is not one to be passed slightly over. On the contrary it underlies the whole law on this subject, and must be determined before any court can give an intelligent judgment, in a case involving new circumstances.
The case of Wheater (2 Moody C.C., 45), affords a striking illustration of the difficulty which arises from the different interpretations of the word voluntary. This being a leading case, and one which is supposed to have settled the law on this subject, it having been carried before the fifteen judges, is deserving of special attention. The prisoner had been convicted of the forgery of an acceptance to a bill of exchange, which, with other forged bills, had been found in his possession. His father, through whose hands the bill had passed, having become bankrupt, the prisoner had been examined on oath before the commissioners in regard to all the bills. Upon the trial his examination before the commissioners had been given in evidence against him, and the question was whether it was properly received. He had previously been discharged by the lord mayor upon a complaint made before him for the forgery.
The argument of Mr. DUNDAS for the prisoner is worthy of notice for its alternation between the two positions that the evidence should have been rejected as unreliable, and because it was compulsorily obtained. He evidently hesitated as to the true interpretation of the word voluntary, as applied to statements made under oath, but inclined to that for which I contend; as plainly appears from his language. After asking whether it could be said "that the examination was voluntary," he adds: "It is submitted that he was under duress, his mind disturbed by the extraordinary situation in which he found himself placed, and called on in the midst of these trying circumstances, to weigh and consider the nature of each question, and the consequences of his answers, and if so, the law cannot estimate the exact degreeof influence of *Page 389 
the duress upon the human mind." Again he says: "The prisoner knew he was under an imputation of felony, and his mind was in that plight, that he was not in a situation to resist any impression made on it."
This shows that it was the disturbing effect of the oath upon the prisoner's mind, taken in connection with the consciousness that he was suspected of the crime; and not its compulsory nature, upon which the counsel mainly relied for excluding the evidence.
The court also was embarrassed by the equivocal meaning of the term voluntary, and it was this embarrassment which caused the dissent of Lord ABINGER and Mr. Justice LITTLEDALE. This appears clearly from the case. Lord ABINGER said in the course of the argument: "I understand, if a prisoner's examination be onoath, it shall not be received in evidence, without reference to a duress or threat. I see no reason for it; in principle the answer may be quite voluntary."
This shows it to have been Lord ABINGER'S impression, that it was the compulsory nature of the oath which excluded the evidence. He was perfectly consistent, therefore, in dissenting, as he did, from the opinion of the majority of the the court; for certainly, so far as its compulsory character was concerned, there could be no difference between the oath administered by the commissioners, and one which might have been administered by the lord mayor, upon the examination of the prisoner before him, when charged with the forgery. The prisoner would have been equally at liberty in either case to decline answering any question which might tend to criminate him. It is not surprising, therefore, that Lord ABINGER should have remarked, that he could "see no reason" for the rule to which he adhered. As understood by him there certainly could be no reason for it.
It is apparent, too, that LITTLEDALE, J., who also dissented, acted under a similar impression as to the foundation of the rule; because the case shows that, upon a previous *Page 390 
occasion, he had gone so far, even in a civil case, as to hold that an admission "obtained under a compulsory examination" before commissioners in bankruptcy, was not evidence of an account stated.
Of the fifteen judges thirteen were present at the hearing of this case, and all, except ABINGER, C.B., and LITTLEDALE, J., were of opinion that the evidence was properly received. Had the majority concurred with Lord ABINGER in the assumption that the objection afforded by an oath, in such cases, arises, not from its tendency to disturb the mind of the prisoner and thus weaken the force of the evidence, but purely from its compulsory character, they must have decided the other way.
It may well be doubted whether that celebrated maxim, nemotenetur prodere se ipsum, has itself any other substantial foundation than the uncertainty and doubt which must ever attend all extorted confessions. If deserving of the commendation it has received, it must, I think, be based upon the idea of protection to the innocent, and not that of mercy to the guilty. But whatever may be the truth on this subject, I hold it to be clear, that when the law rejects a disclosure made under oath by a person charged with crime, it does so, not because any right or privilege of the prisoner has been violated, but because it is deemed unsafe to rely upon it as evidence of guilt. This is strongly to be inferred from that class of cases in which it has been held, that although a confession has been obtained by stratagem, by fraud, by violation of confidence or even of an oath, still, if reliable, the law will avail itself of it.
In Burley's case, the prisoner was told falsely, and as an artifice, that his accomplices were in custody, in consequence of which he confessed; and this confession was received in evidence. (Joy on Con., 42.) In Rex v. Derrington (2 Car. Pa.,
418), the prisoner, while in jail, having written a letter to his father, asked the turnkey to put it into the post, which he promised to do; but, instead of this, the turnkey delivered *Page 391 
it to the magistrates. The letter was offered in evidence and objected to, but admitted. So, in Rex v. Shaw (6 Car. Pa., 372), where the person to whom the confession was made had taken an oath that he would not reveal it; this was held to be no objection to the evidence. If the law was scrupulous about the means of arriving at the truth would it have received such evidence? Is fraud more honorable than force? These cases show this: that the question always is, whether the evidence can be relied upon, and not how it was obtained.
If we look through the authorities by the light of this rule, we shall find them, with few exceptions, harmonious and consistent. It is unnecessary to refer farther to any cases except such as relate to judicial examinations, under oath. The first distinction in relation to such examinations to be deduced from the cases is, that the statement or confession will not be rejected on account of its having been made under oath, unless that oath was administered in the course of some judicial enquiry in regard to the crime itself, for which the prisoner is on trial.
This distinction may be regarded as fully established, by the case of Wheater already referred to. But the case of Rex v.Merceron (2 Stark, 366) decided by Lord TENTERDEN is to the same effect. The prisoner was a London magistrate, and was indicted for misconduct in office. Upon the trial his examination before a committee of the House of Commons, appointed to enquire into the police of the metropolis, was offered in evidence by the prosecution. This was objected to, but admitted notwithstanding his appearance before and examination by the committee was compulsory. The only ground for distinguishing between this case and those where the examination relates directly to the crime would seem to be, the greater mental agitation supposed to exist in the one case than in the other.
Another rule which may now be regarded as settled is, that the statement, although made under oath, and upon a judicial *Page 392 
examination as to the crime, may still be admitted, if at the time it was made, the prisoner was not himself resting under any charge or suspicion of having committed the crime.
There is, however, an apparent conflict between several of the English cases on this point. In Rex v. Haworth (4 Car. Pa., 254), which was an indictment for forgery, the counsel for the prosecution offered in evidence the deposition of the prisoner, made upon the examination of another person, who was charged with the forgery. This was objected to but admitted upon its being shown, by the testimony of the magistrate's clerk, that the deposition was made "before the prisoner was either chargedwith or suspected of having committed any offence."
So, in Rex v. Tubby (5 Car. Pa., 530) upon an indictment for burglary, the prosecuting counsel offered a statement made under oath by the prisoner, at a time when he was not under any suspicion. Upon this being objected to, VAUGHAN, Baron, said: "I do not see any objection to its being read, asno suspicion attached to the party at the time."
On the other hand, in the case of Wheeley (8 Car. Pa.,
250) who was on trial for murder, Baron ALDERSON rejected the statement of the prisoner made under oath before the coroner, although it did not appear that any suspicion rested upon him at the time of the inquest.
It seems also from a note to Haworth's case (supra), that upon a trial for murder before PARK, J., at the Worcester Assizes, the court would not allow the deposition of the prisoner taken at the coroner's inquest to be read, although it expressly appeared that no suspicion had attached to the prisoner at the time the deposition was taken.
The two last cases, however, were directly overruled by the late case of Hendrickson, decided by this court (6 Selden,
13), and as the judgment of the Supreme Court in the present case, was based mainly upon the authority of that of Hendrickson, it is important that we ascertain with precision, *Page 393 
what was decided in that case. The prisoner, who was indicted for the murder of his wife, had been examined before the coroner's jury as a witness. No charge had then been made against him, nor was there any direct evidence at that time, that he had been at all suspected. The question was whether his statement before the jury was admissable in evidence against him.
It was contended on the one hand, 1st, that there was a distinction between statements made before a magistrate and a coroner's inquest; that statements made under oath before the coroner were never admissable, under any circumstances, upon the trial of the party making them for the murder; and 2d, that at all events, such statements could not be admitted where the prisoner at the time of making them was conscious of being himself suspected, and that Hendrickson must have known from the nature of the questions put to him that suspicion rested upon him.
The court decided that the evidence was admissible; but it is not easy to determine, from the report of the case, whether they held this on the ground that Hendrickson did not appear to have testified under a consciousness that suspicion was directed towards him, or upon the ground that even this would not be sufficient to exclude the evidence. PARKER, J., who delivered the prevailing opinion, speaking on this subject, says: "At the time of his examination no circumstances warranting a suspicion
against him had been proved. The post mortem examination did not take place until the next day."
But as those who contended for the exclusion of the evidence insisted that it did appear not only that Hendrickson was suspected, but that he must have known this, we cannot tell whether the court meant to hold, with Judge PARKER, that there was not sufficient proof of the existence of such suspicion and knowledge at the time of the inquest, or to overrule the position that such proof would exclude the evidence. At all events, the most which it can be *Page 394 
claimed the case decides is, that it is not sufficient to exclude the statement of the prisoner, made on oath before the coroner's jury, to show that at the time it was made the prisoner was aware that suspicion was directed towards him.
This is an entirely different question from that which this case presents. Here the prisoner, at the time he was called upon to testify, was under arrest by a public officer upon a suspicion of having committed the crime. There can, I apprehend, be no doubt that, had he been under arrest upon a warrant issued by the coroner or by a magistrate, under a direct charge of having committed the murder, the evidence must be excluded.
In Rex v. Owen (9 Car. Pa., 83), the question arose whether the testimony of the prisoner at the coroner's inquest was admissible. He had been brought before the jury, not as a party charged with the crime, but as a witness merely. The question was considered one of so much doubt, that WILLIAMS, J., while he admitted the evidence, reserved the point for the opinion of the fifteen judges.
But in Owen's second case (9 Car. Pa., 238), where the same question arose upon the same deposition, GURNEY, B., considered the point so clear that he would not even reserve the question, and the evidence was rejected.
Mr. JOY, in collating these two with other cases, lays down the rule as follows: "A statement, not compulsory, made by a party not at the time a prisoner under a criminal charge, is admissible in evidence against him, although it is made uponoath." (Joy on Conf., 62.) This writer evidently considered that Baron GURNEY went too far in rejecting the evidence when the prisoner was in custody as a witness only; but his rule concedes that, had he been in custody upon "a criminal charge," the exclusion would have been right. This is also virtually conceded by PARKER, J., in the case of Hendrickson. He says: "In all cases, as well before coroners' inquests as on the trial of issues in court. *Page 395 
where the witness is not under arrest or is not before the officer on a charge of crime, he stands on the same footing as other witnesses."
In order therefore to sustain the decision of the Supreme Court in the present case, it must be shown that there is ground for a distinction in principle between an arrest upon a magistrate's or coroner's warrant and an arrest upon the same charge by a public officer without warrant.
Here we see the importance of determining why it is that the statement of a prisoner is ever rejected because made under oath. If, as argued by the counsel for the people, it is because a mere arbitrary rule, which prohibits magistrates from taking the examination of prisoners charged with crime upon oath, has been violated, then perhaps the decision in this case may have been right; but if, on the other hand, the rejection in such cases flows, as I believe, from the same principle which rejects statements drawn out by promises or threats, viz., that the evidence is too uncertain to be safely relied upon, then it will be found difficult to sustain it.
The position of the counsel for the prosecution cannot, I think, be maintained. It is in conflict with all the English cases on the subject of the admissibility of the examinations of prisoners before a coroner's jury, and it suggests no rational foundation for the prohibitory rule from which the exclusion is supposed to flow. That the idea of immunity or privilege does not lie at the basis of this rule of exclusion, is proved by the fact that the evidence is equally inadmissible although the prisoner voluntarily consents to be sworn. This leaves no other foundation for the rule than that which I have suggested, viz.: that the statement to be admissible, must proceed from the internal and spontaneous impulses of the prisoner alone, uninfluenced by any extraneous cause, of sufficient force to prevent free and voluntary mental action. It is considered that a judicial oath, administered when the mind is disturbed and agitated by a criminal charge may have that effect, and hence the exclusion. Upon no *Page 396 
other principle, as I conceive, can the cases be reconciled with each other or with reason.
The case of State v. Thompson (Kirby, 345), tends strongly to confirm the view of the rule here taken. The question was, whether certain statements of the prisoner, who was indicted for passing a counterfeit loan office certificate, could be given in evidence against him upon the trial. The judgment of the court, as stated by the reporter, was as follows: "By the whole court. When disclosures of that kind have been made to the authority examining, or to the state's attorney, under such circumstances that the person disclosing considered himself as a witness, the court have never allowed it to be given in evidence against him."
It is plain that the court in this case, based the exclusion of the evidence upon the influence exerted by the circumstances upon the mind of the prisoner, because they say, if he "consideredhimself as a witness" although not actually sworn, his statement could not be received. As this court embraced, at that time, the strong common sense of ROGER SHERMAN, and the eminent ability of Chief Justice ELLSWORTH, both of whom appear to have been present when the decision was pronounced, the case would seem entitled to some consideration.
Assuming then, as I think I safely may, that it is the uncertain and unreliable nature of the evidence which excludes it, what difference does it make in principle whether the prisoner is in custody of the officer upon a warrant, or without warrant, the charge being the same in either case? Would the mental disturbance be any less in the one case than in the other? Clearly not. If, then, the main principle which I have endeavored to maintain is correct, it must of course follow, that the evidence in this case, if objected to, should have been excluded. The objection, it seems, was not in point of fact taken, until after the testimony had been given. But the subject has been treated throughout the case by both court and counsel, as if the objection had *Page 397 
been taken in time, and I think it should be so treated here, without regard to the question whether a motion to strike out, is equivalent to a preliminary objection to the evidence.
However clear the proof of the prisoner's guilt in this case may be, it is better that the people should be put to the trouble of establishing it upon a second trial, than that the force of a salutary rule, upon which life may often depend, should be impaired. I concur in the sentiment expressed by Baron HOTHAM, inThompson's case (1 Leach, 291), where upon rejecting evidence upon a statement made by the prisoner, he said: "Too great a chastity cannot be preserved on this subject."
The judgment should be reversed and a new trial should be ordered.
COMSTOCK and BROWN, Js., did not hear the argument: all the other judges concurring.
Judgment reversed, and new trial ordered.