## Court of Appeals.

*October*, 1886.

### PEOPLE *v.* MONDON.

(Reversing 4 *N. Y. Crim. Rep.* 112.)

#### CONFESSION.

An examination of a person arrested upon a criminal charge, conducted in

violation of the statutory provisions, is not admissible against him on his trial for the offense.

If at the time of the examination of a person before a coroner's jury, it appears that a crime has been committed, and that he is in custody as the supposed criminal, he is regarded not merely as a witness but as a party accused, called before a tribunal having power to investigate preliminarily the question of his guilt, and he is to be treated in the same manner as if brought before a committing magistrate; and an examination not taken in conformity with the statute cannot be used against him on his trial for the offense:

But the testimony of a witness at a coroner's inquest held before it has been ascertained that a crime has been committed, or before any person has been arrested charged with the crime, may be used against such witness (should he be afterward charged with the crime) upon his trial for the offense.

The provisions of section 395 of the Code of Criminal Procedure only apply to voluntary confessions and do not change the statutory rules relating to the examination of persons charged with crime.

APPEAL by Frank Mondon, the defendant, from a judgment of the General Term of the Supreme Court in the Third Department of November 19, 1885, affirming a judgment of the Court of Oyer and Terminer of Herkimer county of May 23, 1885, convicting defendant of murder in the first degree.

The facts fully appear in the report of the case at General Term 4 *N. Y. Crim. Rep.* 112, and in the following opinions.

*J. J. Duddleston Jr.*, (*H. C. Hall*, of counsel), for defendant, appellant.

*Eugene E. Sheldon* (district attorney), for the people, respondents.

RAPALLO, J.—The appellant was convicted (at a Court of Oyer and Terminer held in Herkimer county in May, 1885) of the crime of murder in the first degree, for killing one John Wishart, and was sentenced to death. On appeal to the Supreme Court the conviction was affirmed at a General Term held at Syracuse in November, 1885. BOARDMAN and HARDIN, JJ., delivered opinions for affirmance, and FOLLETT, J., delivered a dissenting opinion. The case now comes before us on appeal from the judgment of affirmance.

Numerous exceptions were taken at the trial; and after a careful examination we concur in the conclusions reached by the Supreme Court as to all of the points raised on behalf of the appellant, except the one upon which the learned judges who heard the case at General Term differed in opinion; and we shall therefore confine our discussion to that point.

The question in difference was the admissibility in evidence, upon the trial of the prisoner, of statements alleged to have been made by him on his examination under oath at the coroner's inquest, held upon the body of the deceased after it had been found, which was a considerable time subsequent to the killing. The evidence connecting him with the crime, aside from his alleged confession to the members of the family and afterwards to the officer having him in custody, was circumstantial, but no question as to its sufficiency arises here.

After the finding of the body of the deceased, the defendant was arrested, without warrant, as the suspected murderer. While he was thus in custody, the coroner impaneled a jury and held an inquest; and the defendant was called as a witness before the inquest and was examined by the district attorney and by the coroner.

The prisoner was an ignorant Italian laborer, unfamiliar with the English language. He was unattended by counsel, and it does not appear that he was in any manner informed of his rights, or that he was bound to answer questions tending to criminate him. He was twice examined; on the first occasion the examination was taken by questions put either by the district attorney or by the coroner, and the result written down by the coroner, who then read the evidence over to him, line by line, and asked him if he understood it and if it was the truth, and he said it was; and the coroner then re-swore him to the deposition.

The coroner testifies that he came to the conclusion that the defendant did not understand English well enough to be examined; that on taking the evidence which was signed by him, no interpreter was used; that the interpreter was used on a subsequent day; that the defendant made no corrections or suggestions while the deposition was being read to him; that

he (the coroner) became satisfied, after taking defendant's testimony on the first day, that it ought to be taken through an interpreter, and thought they might get it a little better and a little fuller.

The court thereupon reserved its decision as to the admissibility of the evidence until the opening of the court on the following day.

The coroner was then asked various questions as to what the defendant had stated at the coroner's inquest; as to his having been on the ground where the body of deceased was found; as to when he had last seen the deceased alive; as to where deceased was then going; whether he was alone; as to the whereabouts of the defendant on the day the deceased disappeared; as to threats made by deceased to have the defendant arrested for marrying the daughter of the deceased, while having another wife living; as to disputes between deceased and defendant on that subject; and other questions tending to establish the theory of the prosecution as to the motive of the defendant in committing the murder.

Some of the statements of the prisoner on his examination, as testified to by the coroner, confirmed the theory of the prosecution as to the hostile feeling between the prisoner and the deceased, and the quarrels which had taken place between them; but the others were denials of implicating circumstances.

Each of the questions thus put to the coroner, as to what the prisoner had testified to, was specifically objected to. The objections were overruled and exceptions duly taken.

The deposition taken by the coroner, as before stated, was not offered in evidence; but the coroner in giving his testimony referred to it to refresh his recollection with respect to the testimony given by the defendant on the inquest. The coroner also testified that a club which was found near the body of deceased was produced at the inquest, before the taking of testimony began; that the defendant had then been informed that he was charged with the murder of deceased, and on the production of the club exclaimed: "Me no kill old John with that club;" and appeared nervous and excited.

It thus appears that when the prisoner was called upon to

make his statements under oath before the coroner, he stood in the attitude of an accused person, and was required to answer for himself, as a party, and not as a mere witness to aid the coroner in investigating the cause of the death of the deceased.

The cause of death was evident. The body had been examined, with the marks of violence plainly apparent; the bruised head, the fractured skull, and the broken club lying near it, with hair still adhering to it. It was evident that a crime had been committed. From the time that a felonious homicide was established the proceedings assumed the form of a criminal investigation. Hendrickson v. People (per GARDINER, J.), 10 N. Y. 49.

By section 777 of the Code of Criminal Procedure it became the duty of the jury, if the death was occasioned by criminal means, to find who was guilty thereof; and on such finding the coroner was empowered to issue warrant for the arrest of the guilty party, if not already in custody. From that time the prisoner occupied the position of a person accused of crime; and his situation was similar to that of such a person before an examining magistrate. "And although the tribunal might be different, yet, upon principle, his rights would be the same in both cases." 10 N. Y. 48.

In Teachout v. People (41 N. Y. 9), WOODRUFF, J., in commenting upon the case of McMahon v. People, says: "The coroner was in such case substantially in the place of an examining magistrate; and the fact that the prisoner was held under an arrest without warrant could not make his protection against such an inquisition less imperative;" and at page 12 the same learned judge says that declarations made under examination, with such a charge impending, should be excluded except where obedience to the statutory precautions is observed.

The admissibility of examinations in evidence upon the trial of the offender, has been passed upon in many English cases, but the whole subject has been so thoroughly discussed in three cases in this court that it is not necessary to refer particularly to the English authorities.

In Hendrickson v. People (10 N. Y. 13), the wife of the de-

fendant died suddenly in the morning; and in the evening of the same day a coroner's inquest was held. The defendant was called and sworn as a witness upon the inquest. At that time it did not appear that any crime had been committed, or that the defendant had been charged with any crime or even suspected, except so far as the nature of some of the questions asked of him might indicate such a suspicion. On his subsequent trial, on an indictment for the murder of his wife, the statements made by him at the coroner's inquest were held admissible, upon the ground that he was not examined as a party charged with the crime; that it had not even appeared that a crime had been committed; and that he had simply testified as a witness upon the inquiry as to the cause of death.

In People *v.* McMahon (15 *N. Y.* 384), the defendant was arrested by a constable, without warrant, on a charge of having murdered his wife. The constable took him before the coroner, who was holding an inquest on the body, by whom he was sworn and examined as a witness. It was held that the evidence thus given was not admissible on the prisoner's trial for the murder, and his conviction was reversed upon that ground. In the judgment all the judges who heard the case concurred.

The next case is Teachout *v.* People (41 *N. Y.* 7). In that case the defendant appeared at the coroner's inquest, in pursuance of a subpœna to testify, and voluntarily attended. He was not under arrest, but was informed by one Dalley that it was charged that his wife had been poisoned, and that he would be arrested for the crime. Before he was sworn he was informed by the coroner that there were rumors that his wife came to her death by foul means, and that some of those rumors implicated him, and that he was not obliged to testify unless he chose. He said he had no objection to telling all he knew. The learned judge delivering the opinion preludes it by a reference to these facts, as showing that the statements made were voluntary in every legal sense; and held that a mere consciousness of being suspected of a crime did not so disqualify him that his testimony, in other respects freely and voluntarily given, before the coroner, could not be used against him on his trial on a charge subsequently made, of such crime.

On that ground he held the evidence properly admitted, at the same time referring with approval to the McMahon case, and distinctly limiting the rule of exclusion to cases within its bounds.

The present case is identical in all its essential features with the McMahon Case. In both cases the prisoner had been arrested without warrant, as a suspected murderer. While under arrest he was taken by the officer having him in charge before the coroner's inquest, and examined on oath as to circumstances tending to connect him with the crime.

The present case is even clearer than the McMahon case, for here the homicide had been shown before he was examined, the prisoner was informed that he was charged with the murder, the alleged instrument of death was produced, and the prisoner was interrogated as to his motive for the alleged killing, his whereabouts, and other inculpating matters.

There has been no case overruling the McMahon Case, and we are not referred to any decision, either in this country or in England, at variance with it, although there are many which sustain it and even go further in the direction of excluding examinations under oath, before a magistrate, of persons afterwards put upon trial on criminal charges. Rex *v.* Lewis, 6 *Carr & P.* 161; Rex *v.* Davis, *Id.* 177; Reg. *v.* Wheatland, 8 *Id.* 238; Haworth's case, 4 *Id.* 254, *note.*

The court at General Term in the present case seemed to regard the case of People *v.* McGloin (91 *N. Y.* 241; 1 *N. Y. Crim. Rep.* 154), as sustaining the course pursued by the prosecution, and consequently overruling the McMahon case, but a brief examination will show that there is no analogy between the two cases. The case of McGloin was not that of the examination of a prisoner on oath before a magistrate before whom he was taken involuntarily while in custody, and interrogated by the magistrate, who to all appearance had power to require him to answer; but it was a clear case of a voluntary confession. The prisoner was not taken before any magistrate. While under arrest he said to the inspector of police, who had him in charge, that he would make a statement. The inspector then said he would send for Coroner Herman to take it. The

coroner was then sent for and came to police Headquarters, and took down in writing the confession dictated by the prisoner, the coroner asking no questions and not acting in any official capacity, but as a mere amanuensis, to take down the confession and prove the contents. Whether sworn or unsworn is immaterial, as the confession was in no respect compulsory, but was voluntarily offered by the prisoner. It was not taken before a magistrate, upon a judicial investigation against a person accused of the commission of the crime. It lacked this essential element of the McMahon case, and is in no respect in conflict with it.

Section 395 of the Code of Criminal Procedure is also referred to as superseding the McMahon Case. That section provides that "A confession of a defendant, whether in the course of judicial proceedings or to a private person, can be given in evidence against him, unless made under the influence of fear produced by threats; or unless made upon a stipulation of the district attorney that he shall not be prosecuted therefor."

The rule thus established is founded upon the common law rule on the subject of confessions, but is much more definite and stringent. The rule as laid down in *Hawkins* is stated to be that "A confession, whether made under an official examination or in discourse with private persons, which is obtained from a defendant, either by the flattery of hope or by the impression of fear, however slightly the emotions may be implanted, is not admissible in evidence."

By the section of the Code quoted, the fear which is required to exclude the confession must be a fear produced by threats, and the hope must be based upon a stipulation of the district attorney, promising immunity from prosecution for the crime confessed. But I do not apprehend that this provision was intended to apply to any but voluntary confessions, or to change the statutory rules relating to the examination of prisoners charged with crime. The Criminal Code retains the provisions of the Revised Statutes applicable to such examinations, which provisions are framed with reference to the constitutional provision that no person shall, in any criminal case, be compelled to be a witness against himself. Art. 1, § 6.

In all cases in which reference has been made to the subject, it seems to be conceded that an examination of a person arrested on a criminal charge, conducted in violation of the statutory provisions, would not be admissible in evidence against him on his trial for the offense.    To take a prisoner before a magistrate, swear him, subject him to a minute interrogation as to the circumstances relied upon as evidence of his guilt, and then use such an examination on his trial, would be a departure from our system of criminal jurisprudence which should not be tolerated; and whether the investigation were conducted before a committing magistrate or before a coroner's jury could make no substantial difference, provided it appeared that a homicide had been committed, and the prisoner was brought before the inquest as an accused person, and the object of the inquisition was to ascertain his guilt.

The McMahon case held distinctly that an examination thus conducted before a coroner's jury could not be used on the trial of the prisoner; and after that decision has stood for nearly a century as the law of the State it would require, for the purpose of overruling it, something much more definite than anything that can be found in the Penal Code or the Code of Criminal Procedure.    There is nothing indefinite in the doctrine of that case as defined and limited in the Teachout case; nor am I able to see that an adherence to it would in any way embarrass the administration of criminal justice in this State; while on the other hand it is not difficult to see that a departure from it would be subversive of some of the fundamental principles of our criminal jurisprudence.    Nor is there anything in the exclusion of such evidence inconsistent with section 395 of the Code.

The evidence sought to be excluded is not a confession, certainly not a voluntary confession, but an official examination on oath of the prisoner while in custody, in which, although he admits some facts in regard to the relations between him and the deceased, he denies all knowledge of the crime; he denies having seen the deceased after he saw him on the railroad track on the day when he left his home; and he denies ever having been on the ground where the body was found.

These denials were much more important to the prosecution than any of the admissions contained in the examination, for they were met by the evidence of the prisoner's subsequent admissions to Sheriff Brown, which, if true, showed that his previous statements under oath before the coroner's inquest were false.

This mode of examining and involving a prisoner arrested on a charge of crime is not sanctioned by the provision of section 395 of the Penal Code, which declares voluntary confessions made "in the course of judicial proceedings" admissible in evidence. Those words do not necessarily refer to a judicial examination of the prisoner, upon the subject of the charge made against him. The object of section 395 is to declare what confessions shall be deemed voluntary, and therefore admissible, whether made out of court to a private person, or in court, or in the course of any judicial proceeding between any parties. The examination of a prisoner upon oath before a magistrate, upon the subject of the charge made against him, is condemned in the McMahon case and those upon which it rests, in the Teachout case and by the statutes which prohibit such examinations. *Code Crim. Pro.* §§ 188, 196, 198; 2 *R. S.* 708, §§ 14–16.

The three cases which have been cited, Hendrickson's, Mc-Mahon's and Teachout's, draw the line sharply, and define clearly in what cases the testimony of a witness examined before a coroner's inquest can be used on his subsequent trial, and in what cases it cannot. Where a coroner's inquest is held before it has been ascertained that a crime has been committed, or before any person has been arrested charged with the crime, and a witness is called and sworn before the coroner's jury, the testimony of the witness (should he afterwards be charged with the crime) may be used against him on his trial; and the mere fact that at the time of his examination he was aware that a crime was suspected, and that he was suspected of being the criminal, will not prevent his being regarded as a mere witness whose testimony may be afterwards given in evidence against him. If he desires to protect himself he must claim his privi-

lege. But if at the time of his examination it appears that a crime has been committed, and that he is in custody as the supposed criminal, he is not regarded merely as a witness but as a party accused, called before a tribunal vested with power to investigate preliminarily the question of his guilt, and he is to be treated in the same manner as if brought before a committing magistrate; and an examination not 'taken in conformity with the statute cannot be used against him on his trial for the offense.

On this ground the judgment should be reversed and a new trial ordered.

ANDREWS, DANFORTH and FINCH, JJ., concur.

EARL, J. (dissenting).—There was no difference of opinion in the Supreme Court and there has been none here, as to any of the questions involved upon this appeal, except as to the reception in evidence of the defendant's statement made at the coroner's inquest; and we all agree that this conviction should be affirmed, unless that evidence was incompetent.

The defendant was under oath when he made these statements, and under arrest without warrant, and had been informed that he was charged with the murder of Wishart; and hence the claim is made that the case of People *v.* McMahon, 15 *N. Y.* 384, is a precise authority for the exclusion of the evidence.

In that case it appeared that the defendant was arrested by a constable, without warrant, upon suspicion of being the murderer of his wife, and was taken before the coroner who was holding an inquest on her body; and he was there sworn and examined as a witness; and it was held that his evidence thus given was not admissible on his trial for the murder.

But that case was criticised and distinguished in the case of People *v.* Teachout, (41 *N. Y.* 7), where it was held that statements made by the defendant under oath, at a coroner's inquest upon the body of the person murdered, were admissible against him upon his trial for the murder, although he knew at the time he was sworn that it was suspected that the deceased was

poisoned, and that he himself would probably be arrested for the crime, and was informed by the coroner that the rumors implicated him and that he had a right to refuse to testify.

In both cases the prisoner was charged with the crime, and gave evidence knowing that he was so charged. In the latter case the defendant was not under arrest, but was informed before he gave his evidence that he was going to be arrested for the crime. The fact that the prisoner was not under arrest does not distinguish that case from the former case. There can certainly be no difference in the evidential value of statements made under oath by one under arrest and charged with crime and similar statements made by one charged with crime after he has been informed that he is going to be arrested.

The reasoning of all the cases on the subject shows that there can be no difference in principle or in law between such statements, and no ground for their exclusion in the one case which does not apply to the other.

The only circumstance, therefore, which distinguishes the latter case from the former is that in the latter case it appeared that the coroner, before the defendant was sworn, informed him that he was not obliged to testify unless he chose, and that the defendant said he had no objection to telling all he knew.

For aught that appears in this case, the defendant was informed, by the coroner or some one else, of his right to refuse to testify; that he perfectly understood his rights and in every sense voluntarily took the oath and made his statement. The district attorney had no occasion to prove these facts, as neither his attention nor the attention of the court was called to the absence of such proof or the necessity to make it.

It does not appear how the defendant happened to come before the coroner nor what information he had as to his rights before he was sworn. When evidence of these statements was offered at the trial, the only ground of objection stated in any case was that they were immaterial. The only ground of exclusion was that the defendant had not been informed, before he was sworn, of his right to refuse to be sworn and to testify; and that ground of objection should have been specially stated, as, if it had been, it might have been obviated by proof. We

must now assume that that ground did not exist or was waived. Such is the rule in civil cases, and it has been also applied in criminal cases. People v. Murphy, 63 N. Y. 590.

If we could see that the evidence was of vital and controlling importance in this case, or if we entertained any doubt of the defendant's guilt, we might be disinclined to this view of the case. But a careful reading of the evidence leaves upon our minds no reasonable doubt of his guilt; and the statements made by him before the coroner could have had neither an important nor a controlling influence upon the minds of the jury.

The relations between Wishart and the defendant, showing a motive for the murder, and threats to kill him, were fully proved by other witnesses. His statements tended, if believed, to exculpate him; and the most material of them became important only as they were by other evidence shown to be untrue. There was much evidence of false statements made by him, when not under oath, after the disappearance of Wishart, of a character similar to those made before the coroner, and there was evidence, apparently reliable, that he confessed the murder.

Under such circumstances, assuming that the law remains now as it was when the cases above referred to were decided, we see no reason for holding that any error was committed by the reception of the statements in evidence; and for this we invoke the latter case as authority.

But this case is of such serious importance that we are unwilling to rest our decision entirely upon a ground which might seem to be narrow and technical, and therefore we proceed further.

Radical changes have been introduced into the law of evidence since the decision in the McMahon case. A prisoner may testify in his own behalf, and section 395 of the Code of Criminal Procedure provides as follows: "A confession of a defendant, whether in the course of judicial proceedings or to a private person, can be given in evidence against him unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney that he shall not be prosecuted therefor; but is not sufficient to warrant his con-

viction, without additional proof that the crime charged has been committed."

This language is plain and broad, and makes every confession competent no matter how made or how obtained, with the exceptions mentioned. The defendant's statements were made in a judicial proceeding, and this section is ample warrant for their reception in evidence upon his trial.

Confessions of prisoners, in judicial proceedings and to private persons, may be made or obtained under such circumstances as to deprive them of much value as evidence, but they may always be proved unless excluded by the exceptions mentioned; and then their weight, under proper instructions from the court, must be determined by the jury.

There is nothing in the previous history or condition of the law as to confessions which limits the meaning of this section or restricts the import of its general phraseology. That law was in a very unsatisfactory condition and many of its rules rested upon no philosophical or reasonable basis. The general rule was that the confessions of a prisoner in reference to the crime for which he was put upon trial, whenever and wherever made, were admissible in evidence against him, and were the most effectual and satisfactory proofs of guilt.

To this rule, however, there were exceptions. If the confessions were obtained or induced by threats or promises, they were excluded. The threats or promises might be quite slight, insignificant and indirect, and yet the cases are numerous where they were held sufficient to render confessions obtained by them incompetent as evidence.

There was a difference of opinion among learned judges as to whether the threats and promises, to be effectual for the exclusion of the confessions, must have proceeded from the prosecutor or some public officer having the prisoner in custody or some authority over him, and not from a private person having no connection with the prosecution. If the confessions, however, were made after the threats or promises might be supposed to have ceased to have any influence upon the mind of the prisoner, they could be received in evidence. So, while it was necessary to the admissibility of a confession that it should.

have been voluntarily made, that it is that it should have been made without the appliances of hope or fear, from persons having authority, yet it was not necessary that it should have been the prisoner's own spontaneous act. It might be obtained or induced by spiritual exhortations; by promises of secresy, even confirmed by an oath, by causing the intoxication of the prisoner; by trick, deception or artifice; by illegal arrest; by promises of some collateral benefit; and yet none of these practices made the confession incompetent or required its exclusion.

These rules were uncertain, difficult of application, and gave the courts much trouble, and the section of the Code above quoted was framed so as to furnish a·general and simple rule easily understood and certain in its application. It applies to all confessions whether made in a judicial proceeding or to private persons, and its language is just as broad, comprehensive and sweeping in reference to one class as the other. The two classes of confessions were known in the law before that section was enacted. Judicial confessions were defined to be such as were made before a magistrate or in court, in the due course of legal proceedings, and all other confessions made to private persons were defined to be extra-judicial. 1 *Greenl. Ev.* §§ 216, 217.

Within the meaning of the Code, and the law as it before existed, these were confessions made in a judicial proceeding. The law as to judicial confessions was, before the Code, in as much confusion and uncertainty (and needed reformation as much) as the law in reference to extra-juducial confessions, and this may be shown by reference to a few reported cases.

In People *v.* Hendrickson (10 *N. Y.* 13) the subject of judicial confessions was much investigated and discussed. In that case the prisoner's wife died from poisoning, and a coroner's inquest was held to ascertain the cause of her death. The prisoner was sworn and examined as a witness at the inquest, and there made certain statements as to his movements on the night of his wife's death and the circumstances attending it. He was subsequently indicted for her murder; and upon his trial the statements he made at the inquest were offered in evidence

against him. They were objected to as inadmissible, but were held to be competent evidence, upon the ground that the prisoner had not, when he made them, been charged with the murder. But it is clear that he was suspected of the murder and knew that he was so suspected.

Judge SELDEN wrote a dissenting opinion, holding that the statements were incompetent, upon the ground that such statements, made by one suspected of guilt and conscious thereof, were too unreliable to be received as evidence. The learned judge seems to have been unconscious that his reasoning would exclude all confessions of a prisoner made after being charged with the crime, and even after he was conscious that he was suspected of the crime. But one judge concurred in the view that the statements were not competent evidence.

When the McMahon case came before the same court, more than three years later, the judges comprising the court had been so far changed that only three of those remained who had taken part in the decision of the Hendrickson case; and SELDEN, J., being one of these, wrote the opinion in which four of his associates concurred, and the same line of reasoning which had failed to convince in the Hendrickson case prevailed. The statements of the prisoner made at the coroner's inquest were held incompetent, because at the time he made them he was charged with the crime. The ground of the decision was that a judicial oath, administered when the mind is agitated and disturbed by a criminal charge, may prevent free and voluntary mental action, and that thus the statements cannot be relied upon as evidence of guilt.

But what difference in reason can there be between the value of statements as evidence when made by a person charged with crime and when made by one who knows that he is suspected of crime and is conscious of guilt? Why should such statements, when made under the sanction of an oath voluntarily taken be excluded, when they would be received if made under precisely the same circumstances not upon oath?

When the Teachout case came to be decided, more than twelve years after the McMahon case, the composition of the court had been entirely changed, no one of the judges remain-

ing who had participated in the decision of the prior cases. In that case the prisoner was not under arrest when he made his statements under oath before the coroner's jury; but he was informed that he was suspected of the crime and that he would be arrested for it, and the coroner told him that he had a right to refuse to testify; and the statements were held competent evidence. What difference could it make with the value and reliability of the statements, as evidence, that the prisoner was not under arrest when he made them, while he was informed that he was suspected and was to be arrested? Upon the reasoning of SELDEN, J. in both of the prior cases, it was wholly immaterial that he was informed that he had the right to refuse to testify.

In the Hendrickson case, the learned judge said: " A statement made under oath before a coroner's jury, while the party is under arrest upon suspicion of guilt, is equally voluntary as if made as a witness in a case with which he has no connection;" and " It is certain that the statements of an accused person, made under oath, are never excluded on account of any supposed violation of the immunity of the party from self crimination."

In the McMahon case, he said: "The statement, although made under oath and upon a judicial examination as to the crime, may still be admitted, if at the time it was made the person was not himself resting under any charge, or suspicion of having committed the crime." " That the idea of immunity or privilege does not lie at the basis of this rule of exclusion is proved by the fact that the evidence is equally inadmissible, although the person voluntarily consents to be sworn."

In the Teachout case, the reasoning of Judge SELDEN in the two prior cases was emphatically repudiated; but without distinctly overruling the McMahon case the court found a distinction which was regarded as of no importance by Judge SELDEN.

It is, indeed, quite difficult to perceive what difference in reason or in principle can be caused by the fact that the person was informed of his privilege not to testify, a fact which most persons know and which they must all be presumed to know; and it is even more difficult to understand how the statements

of a person are in their nature more trustworthy and reliable after he has been so informed than they would be without such information.

The McMahon case was, several years later, regarded by a learned judge as overruled by the Teachout case. People *v.* Montgomery, 13 *Abb. N.*

But even if that judge was in error it may well be doubted whether the rule laid down in the McMahon Case survived the legislation and the public policy thereby announced, which allowed prisoners to testify in their own behalf.

As we have seen, the statements were there excluded because such statements, made under an oath voluntarily taken by a prisoner charged with crime, are in their nature too unreliable to be received as evidence. That ground of exclusion was utterly repudiated by the legislation referred to. If the sworn statements of a person before a coroner's jury, after he was charged with crime, were too unreliable to be received as evidence, much more would his sworn statements be unreliable, made upon his trial after indictment, when the question of his life or death was under investigation and to be immediately determined. It cannot be supposed that the legislature meant to make that evidence, which in its nature was so infirm and worthless that it would be unsafe for a jury to rely upon it as a basis for their judgment. It would be quite an absurd spectacle to see a court exclude the sworn statements of a prisoner made before a coroner's jury, and at the same time receive his sworn statements made upon his trial for the crime.

Such was the state of the law as to judicial confessions when the section of the Code referred to was framed. The rule as finally settled, in order to make statements made by the prisoner under oath at a coroner's inquest (after he was charged with the crime) competent evidence against him upon his subsequent trial, required that it should be shown that he was advised of his right not to be sworn before he made the statements. If not so advised his statements so made were incompetent. But if the public prosecutor believed that the person was guilty, and fully intended to arrest and indict him, he had

only to conceal from him his belief and intention and omit to charge him with the crime and then, although he was conscious of his own guilt and thus under the embarrassment created by such consciousness, he could examine him to any extent and procure from him, while he was unadvised and unaware of his peril, damaging statements to be used against him upon his trial. A rule so absurd in its operation is of little use for the protection of persons charged with crime, and the court should not be astute to preserve it.

It must be conceded that the law makers intended to make and did make a radical change, by the section referred to, in the law in reference to extrajudicial confessions; and it is not unreasonable to suppose that they intended an equally sweeping change in the law in reference to judicial confessions. They evidently meant to abolish all the fine distinctions which before existed, and establish a plain and simple rule; and they wrote in the section all the exceptions which they intended to preserve, and no court should interpolate more. If it had been intended that judicial confessions should not be received in evidence against the person making them, unless he had been advised of his privilege not to make them, that exception, it is fair to presume, would have been made in the section. That section, too, it may be observed, is in the line of all modern legislation upon the subject of evidence, the tendency of which is to permit all relevant and material evidence to be placed before the triers of fact, there to receive the consideration it deserves.

It cannot well be claimed that these statements were not a confession within the meaning of the section. It is true that they were not a confession of crime but rather exculpatory; a denial of the crime. But such statements have always, in all the books, been classed under the head of confessions. Whatever one says about the crime with which he is charged which tends to connect him therewith or makes evidence against him in reference thereto, whether he so intends it or not, has always been treated as a confession.

In the Hendrickson case, Judge PARKER said: "The law seems to be that the rule as to confessions applies not only to direct confessions, but to every other declaration tending to

implicate the person in the crime charged, even though in terms it is an accusation of another or a refusal to confess."

If the section of the Code referred only to formal or actual confessions of guilt, it would leave much the larger part of judicial statements made by prisoners entirely unprovided for.

The constitutional guarantee that "No person shall be compelled in any criminal case to be a witness against himself," was not violated in this case. Statements of prisoners made under oath have never been excluded on that ground. On the contrary, that ground of exclusion was expressly repudiated by Judge SELDEN in the McMahon case. The defendant had been in this country for more than two years. All persons within the jurisdiction of the State are supposed to know its laws; and in the enforcement of this rule no distinction is made between foreigners and natives. 1 *Story Eq. Jur.* § 111, *Best Ev.* 48, 452.

We must assume that he knew that it was his privilege to decline to be sworn, and that he voluntarily took the oath and made the statements. It was not claimed upon the trial that he was ignorant of his privilege, or that he was under any compulsion when he took the oath. He was therefore in no sense compelled to be a witness against himself.

The view we have taken of section 395 of the Code is sanctioned by the case of People *v.* McGloin (91 *N. Y.* 24; 1 *N. Y. Crim.* 154).

If the reasoning of Judge SELDEN in the Hendrickson and McMahon cases was sound, the confessions there received should have been excluded; but they were held competent evidence both at common law and under the section referred to.

We are, therefore, of opinion that no error was committed in the reception of the statements of the prisoner in evidence and that the judgment should be affirmed.

RUGER, Ch. J., concurs, MILLER, J., not voting.

Judgment reversed.

NOTE.—As to confessions see People *v.* McGloin, 1 *N. Y. Crim Rep.* 105, 154; People v. McCallam, 3 *Id.* 189, People v. Kelly, *Id.* 414, People *v.* Jaehne, 4 *Id.*