BENJAMIN TEACHOUT, Plaintiff in Error, *v.* THE PEOPLE, Defendant in Error.

Statements made by the prisoner, under oath, at a coroner's inquest upon the body, are admissible against him upon his trial for the murder, although he knew, at the time he was sworn, that it was suspected the deceased was poisoned, and that he himself would probably be arrested for the crime, and was informed by the coroner that rumors implicated him, that he had a right to refuse to testify.

*McMahon* v. *People* (15 N. Y., 384), distinguished.
*Hendrickson* v. *People* (10 N. Y., 13), followed.

ERROR to the Supreme Court, at General Term, in the eighth judicial district, to review a judgment affirming a conviction of the plaintiff, in error, at the Wyoming Oyer and Terminer, on the 15th of September, 1868, for the murder of his wife, by poisoning her.

The prisoner's wife died on the 10th of January, 1868, and a coroner's inquest was held upon her body on the 21st of January, 1868.   The prisoner was subpœnaed, by the sheriff of Wyoming county, to appear and testify before the coroner, and did attend, and was examined on oath.

Upon his trial for the murder, the district attorney was permitted, against the objection of the prisoner, to prove, by the

Opinion of the Court, per WOODRUFF, J.

coroner, the prisoner's statements, made under oath at the inquest.

It appeared that upon the day of the inquest, and before the prisoner was sworn, one Dailey asked him why he was there without counsel, and told him that it was charged that his wife had been poisoned, and that he was the man who was to be arrested for the crime.

The prisoner having been convicted, the conviction was affirmed, on error, by the Supreme Court of the eighth district.

*Sanford E. Church,* for the plaintiff in error, insisted that the proof of the prisoner's statements under oath, before the coroner, were improperly admitted against him, and cited *People* v. *McMahon* (15 N. Y., 384, 395); *Rex* v. *Parratt* (4 C. & P., 570); *Rex* v. *Thompson* (1 Lea, C. C., 291); *Rex* v. *Cass* (id., 293, n.); *Rex* v. *Jones* (R. & R., 152); *Rex* v. *Kingston* (4 C. & P., 146); *Rex* v. *Drew* (8 C. & P., 140); *Rex* v. *Mills* (6 C. & P., 146); *Rex* v. *Morton* (2 Mood. & R., 514); *Rex* v. *Sheperd* (7 C. & P., 579); *Rex* v. *Lewis* (6 Carr. & P., 161); *Rex* v. *Davis* (id. 177); *Regina* v. *Wheeler* (8 id., 250); 1 Phil. Ev. (C. & H.'s Notes, 4th ed.), 550, note 156; *Rex* v. *Owen* (9 C. & P., 238).

*A. P. Laning,* for the defendant in error, cited *Hendrickson* v. *People* (10 N. Y., 13); 2 Russ. on Crimes, 860; 1 Phil. Ev., 110, chap. 5, § 5; 1 Greenl. Ev., §§ 215, 219; 1 Cow. & Hill, 232, note 203; *People* v. *Rogers* (18 N. Y., 9); *Hartung* v. *People* (4 Park. 319); *People* v. *Wentz* (37 N. Y., 303); *People* v. *McCraney* (6 Park., 49, 86). That the statement, being under oath, does not affect its admissibility, he cited Hendrickson's case, *supra*; Greenl., § 225; Roscoe Cr. Ev., 45; *Rex* v. *Nebley* (5 C. & P., 530).

WOODRUFF, J. The exhaustive examination and discussion of authorities by court and counsel, in *Hendrickson* v. *The People* (10 N. Y., 13), and *McMahon* v. *The People* (15 N. Y., 384), render it wholly unprofitable to go again though a review of the cases, in which the declarations of a

person made under oath may be received, or must be rejected, when offered as evidence on his trial for a crime.

In my judgment, we ought to regard the decision in the former of those cases decisive of the present. It is quite true that the very able opinion of the learned judge, who alone appears to have discussed the latter case, reiterates most distinctly the views expressed in his dissenting opinion in the former; but we are not warranted in inferring that the other judges intended either to overrule or weaken the effect of the former decision.

In the first case the prisoner had been examined as a witness before the coroner, who was conducting an inquiry into the cause of death, but without any charge having been made against the prisoner, and when he had not been apprised that suspicion rested upon him, except so far as the interrogatories addressed to him were calculated to suggest, that the death was caused by his agency.

In the latter case the prisoner was in actual custody, as a suspected party (without warrant), and was examined by the coroner while in such custody on oath.

In the former case the declarations were held admissible; in the latter they were held incompetent. The precise distinction by which the latter is distinguished, is that in the latter case the prisoner stood before the coroner as a party in fact charged with the crime, and was there subjected to examination on oath touching his own guilt or innocence. The coroner was in such case substantially in the place of an examining magistrate; and the fact that the prisoner was held under an arrest made without warrant, could not make his protection against such an inquisition less imperative.

The present case in nowise differs from that of Hendrickson, save in this: Here, Teachout had been apprised distinctly before he was called as a witness, by one of the persons present, that "it was charged that his wife had been poisoned and that he was the man that was going to be arrested for the crime." He was also, before he was sworn, informed by the coroner "that there were rumors that his wife came to

her death by foul means, and that some of those rumors implicated him."

He was, therefore, examined with full knowledge that he was suspected of having murdered his wife. Whereas, Hendrickson was not otherwise so informed than by the nature and subject of the questions put to him, which it is true were such that I think no intelligent person could fail to perceive that they indicated a distinct suspicion of his guilt.

It is proper, however, to state further, that in the present case, Teachout was further informed by the coroner, before he was sworn, that he was not obliged to testify unless he chose. He said he had no objection to telling all he knew. There is, therefore, in this case, no pretense that the declarations in question were not voluntary, as that word is used in distinction from compulsory; or that they were not voluntary in every legal sense, if a person, under suspicion of having committed a crime, and conscious of that suspicion, can testify voluntarily.

The present case, therefore, presents the single question, whether the law regards consciousness of being suspected of a crime as so disqualifying a person that his testimony, in other respects freely and voluntarily given before the coroner, cannot be used against him on his trial, on a charge of such crime subsequently made, it having been decided that if he be not conscious of such suspicion, such testimony may be used; and in both of the cases above referred to, the mere fact that the declarations are on oath, does not make any difference in the result.

The question is, therefore, reduced to this: Do statements or admissions of a person, which would otherwise be admissible in evidence to convict him of crime, become inadmissible when it appears that such person was, at the time, conscious that he was suspected of the crime? The reasoning of the dissenting opinion in Hendrickson's case, and of the prevailing opinion in McMahon's case, go the entire length of affirming the proposition thus suggested.

It is true that the learned judge is constrained to admit

that the authorities do not affirm the inadmissibility of such admissions by a party under suspicion, unless they are made in some investigation into the crime itself. But the ground upon which exclusion is urged imports no such limitation, for the reasoning is, that "the mental disturbance produced by a direct accusation, or even a consiousness of being suspected of crime," renders such declarations unreliable. The principle of exclusion "has its foundation in the uncertain and dangerous nature of all evidence of guilt drawn from the statement of a party conscious of being suspected of crime."

If that be the foundation of the rule, I perceive no reason for confining its application to admissions or declarations made while under examination touching the crime itself, before any officer, under oath or otherwise. If the declarations, made under consciousness of suspicion, are, for that reason, unreliable, they must be unreliable whenever and wherever made, so long as it is manifest that a desire to ward off suspicion, and avoid the danger of which suspicion gives notice, must operate upon the mind. And equally when the suspected party encounters that suspicion while fully at large, among third parties, as when called as a witness, to state, if he sees fit, what he knows of the cause of the death. And if consciousness of suspicion renders proof of declarations unreliable, so also it should render proof of his acts unreliable, and they should be equally excluded. And yet it has not, I think, been doubted that proof of the acts of the party, under the very pressure of suspicion, is competent. If a party, on receiving information that he is suspected of a crime, flees, or conceals himself, or, by other acts, manifests an intent to elude pursuit or avoid investigation, this may be proved as some indication of conscious guilt; and yet it is consistent with innocence, and may be the mere result of fear, and the pressure of suspicious circumstances may lead the innocent man to resort to this as a measure of safety. This is quite as true as that suspicion will lead a man to false statements for the same purpose.

There must be some limit to the rule excluding declarations, short of the test that they be made when under no consciousness that he is under suspicion. Else the whole conduct of the party, from the moment he is apprised, that he is suspected, must be declared too unreliable to be made the subject of any inference whatever.

That declarations, made under the influence of a charge of guilt, under actual arrest or under examination with such a charge impending, should be excluded, except where a careful obedience to the statutory precautions is observed, is a just concession to the considerations of charity and regard for human weakness, exhibited in the reasoning referred to. More than this would be carrying those considerations further than the public interests and a just regard for public safety will permit.

. The declarations and the acts of the party should be received and weighed by the jury in the same spirit of charity, and with the same regard for human weakness, and with a careful discrimination; for it is plain that the like declarations and acts may have very unlike significance, when exhibited by persons of different temperament, dispositions, habits and history. Conduct, which in one may be justly regarded as strong evidence of guilt, may, in another, be the impulse of sudden alarm or excited nervous apprehensions, which may unfit one, who is perfectly innocent, to act or speak rationally.

The administration of justice should never lose sight of such considerations. Human frailties and human impulses are to be recognized in giving a construction to both acts and declarations, according to all the circumstances under which they are exhibited, and they furnish an appropriate argument to be addressed to those whose province it is to determine upon all the proofs, the question of guilt or innocence.

These views lead me to the conclusion that the case of *Hendrickson* v. *The People* should be regarded as settling the question raised in this case, and that no error in law was committed in permitting the declarations of the prisoner,

made before the coroner, to go to the jury for their consideration.

I find in one of the printed briefs handed to the court, a point made in behalf of the plaintiff in error, which was not argued orally, and yet should not, perhaps, be deemed waived.

On the examination of one of the female witnesses, a neighbor, who occasionally visited the deceased during her sickness, she testified that the deceased complained a good deal of distress, and of a sore throat. This was followed by the following question, put on behalf of the people : " Of what did she complain ? " This was objected to by the counsel for the prisoner, on the gound that it was not competent to prove complaints of the deceased, except when made to a physician in the course of medical treatment. The objection was overruled, and exception taken. The witness answered : " She complained a great deal of distress in her stomach and bowels ; said they felt sore and bad ; limbs were numb."

If the testimony was incompetent, it may not obviate the objection that nearly every other witness who was in attendance upon the deceased had been examined, and testified, without objection, to the like complaints, and in terms nearly identical with those used by this witness.

But I apprehend that the objection is groundless. The natural and impulsive utterances of a person suffering under extreme illness, made to those who are in attendance, or present in the performance of offices of kindness, for the purpose of giving relief or alleviation, are proper evidence of the actual pressure of the symptoms which the sufferer describes. The universal consent of all mankind accords to them some credence, as indications of the state of the sufferer, and they are acted upon in all ministrations for the relief of the distressed. It would be absurd to say that the cries of the patient for water should not be regarded as evidence of thirst, or that complants of pain, made in the usual and natural course, should not be accredited as proof of suffering

My conclusion is, that the judgment must be affirmed.

GROVER, J. (dissenting.)  The question raised by the exception taken by the counsel for the plaintiff in error upon the trial is, whether the testimony given by him before the coroner upon an inquest held upon the body of his, plaintiff's wife, was competent evidence against him upon the trial of an indictment against him, for her murder.  As a foundation for the objection to the testimony, the counsel for the plaintiff proved that he was duly served by the sheriff with a subpœna, requiring him to attend the inquest as a witness; that while so in attendance and before being sworn, he was asked by Edward Daily, why he was there without counsel, and was told by him that it was charged that his wife had been poisoned; that he was the man that was going to be arrested for the crime. The following evidence was given after the plaintiff's testimony upon the inquest had been received upon the trial, and the exception thereto taken, but it was agreed upon the argument that it should be regarded as given prior thereto.  The coroner, who presided at the inquest, testified that he apprised Teachout, the plaintiff in error, that he had a right to refuse to testify; that there were suspicions of foul play; that there were rumors that his wife came to her death by foul means; and that some of these rumors implicated him; that Teachout said he had no objections to telling what he knew about it; that this occurred before Teachout was sworn.  This was equivalent to the coroners telling Teachout that he was accused of the murder of his wife.  From the testimony it appeared that Teachout was told at the inquest, just before being sworn, by a private person, that he was accused of having poisoned his wife and was going to be arrested for it, and by the coroner holding the inquest, that he was accused of having murdered her.  The question is whether the testimony, subsequently given by him upon the inquest, was admissible as evidence against him upon his trial for her murder.  This question was so fully discussed in this court in the case of *The People* v. *Hendrickson*, 10 N. Y., 13, and *The People* v. *McMahon*, 15 N. Y., 384, and the authorities, both English and American, so thoroughly examined, that it would be

superfluous to again go over the same ground. The first was decided by a divided court; the last with the concurrence of all the judges who heard the argument, three of them being the same who participated in the decision of the former. All that is necessary in the present case is to deduce from these two cases the principles settled thereby, and apply such principles to the present case, unless further consideration should show a conflict therein, or that they were so far unsupported by principle and authority as to render it the duty of the court to depart therefrom in determining the present case. It is a little difficult to determine precisely the principle upon which the case of Hendrickson was decided, partly on account of the conflict in the opinion of the judges as published, but more in consequence of the state of facts upon which the question arose. Hendrickson's wife retired to bed with him at about ten or eleven o'clock in the evening; at about two at night he gave an alarm, and his wife was then found dead in the bed. A coroner's inquest was held. It did not appear, at the time he was sworn, that any suspicions were entertained that any crime had been committed, and, of course, no suspicion that any poison had been procured or used in effecting her death. Under these circumstances Hendrickson was sworn. The dissenting judges assumed that he must have known, from the questions put to him while testifying, that a suspicion was entertained that he had caused her death by administering poison to her, and upon this ground were of opinion that his testimony was not competent evidence against him upon his trial for murder. It does not appear from the prevailing opinion, that the majority of the judges concurred with those dissenting in the assumption of any such knowledge by Hendrickson, but from portions of the opinion rather the contrary. The judge says Hendrickson was treated in every respect like the other witness. At the time of his examination no circumstance had been developed warranting a suspicion against him. The post-mortem examination did not take place until the next day; and it was not until the second day after his testimony before

the coroner's inquest, that he was arrested under a warrant issued, not by the coroner, but by a police justice of Albany. Again, after naming authorities, the judge further says, independent of authority, I do not see how, upon principle, the evidence of a witness, not in custody, and not charged with crime, taken either on a coroner's inquest or before a committing magistrate, or a grand jury, could be rejected. Further on he says, nor can the exclusion of the evidence depend upon the question, whether there was any suspicion of the guilt of the witness lurking in the heart of any person at the time the testimony was taken. That would be the most dangerous of all tests, as well because of the readiness with which proof of such suspicion might be procured, as of the impossibility of refuting it. Besides, the witness might have no knowledge of the existence of any suspicion; so that his mind could not be affected or his testimony influenced by it. It is only when he is charged with crime and examined on such charge, that there is good reason for treating him as a party to the proceeding. These extracts from the opinion, with the exception of the last sentence, would show that the judge regarded the case as one simply where the witness had been sworn without any knowledge that he was accused of having criminally caused the death. Viewed in this light, the case is entirely consistent with that of McMahon's. If, in the last sentence, the judge used the words, charged with crime and examined on such charge in the restricted sense of a charge, judicially made against the witness and his judicial examination upon such charge, the case is in direct conflict with that of McMahon, as will hereafter be seen. Besides using the words in that sense, they would rarely have any application to inquests held by coroners. These proceedings are not founded upon any charge against a specific person, nor is the examination of any such person any part thereof. True, they may and often do result in making a charge against and leading to the arrest and commitment of one or more persons. I am inclined to think that the judge used the words

charged with crime in the popular sense; that is, as including an accusation of guilt seriously made by any individual to the knowledge of the witness, as well as a charge legally made to a judicial officer; and that the examination upon such charge includes the case of a witness knowing that he is accused, and testifying with such knowledge. So far as such witness' testimony is concerned, it will be governed by the same considerations as though permitted to testify upon his examination of the like charge judicially preferred against him. The witness would have the same inducement to shape his evidence so as to shield himself from the charge in the former as he would in the latter, and his testimony would be equally unreliable. His testimony may be equally voluntary, using that term in the sense of its being given with the free assent of the will of the witness. The fact that I am right as to the sense in which the words were used by the judge, is strongly confirmed by the fact that the judgments in both Hendrickson's and McMahon's cases were concurred in by two of the same judges. Neither of these could have supposed that there was any conflict in the principle upon which they were decided. My conclusion is, that all that can fairly be claimed to have been decided in Hendrickson's case, is that, where the testimony, upon the inquest upon the body by the coroner, is given by a witness having no knowledge that he is accused of any crime in causing the death, such testimony is competent against the witness upon his trial for the murder of the person upon whose body the inquest was held. In McMahon's case, it was held by this court that the testimony given upon an inquest by a coroner, upon the body of a deceased person, by a witness who had been arrested by a constable, without warrant, on suspicion of being the murderer of such person, was inadmissible against him upon his trial for such murder. An examination of the able and exhaustive opinion in the case, shows that this was so held for the reason that testimony so given is too unreliable and unsafe for consideration in the investigation of truth. There was no pretense but that the testimony was given voluntarily, in the sense of being given

with the free assent of the will of McMahon. There had been no charge judicially made against him. The inquest upon the body was in no sense the examination of a charge of murder against him more than of any other person. His situation, in giving testimony, differed from that of other witnesses sworn upon the inquest, in this respect only : he testified with a knowledge that he was suspected of the crime of murdering the deceased, while the others did not. It was this knowledge, not his arrest by the constable, that rendered his testimony incompetent, and it was only so upon the principle above stated. It was insisted that it was incompetent, for the reason that no one is bound to accuse himself. A little consideration will show that this principle has no application to the case, for the reason that it does not appear that any means whatever, certainly none of a coercive character, were used to induce him to testify. His arrest had no connection with him as a witness, or with his testimony, except only to inform him that he was suspected of the crime. How does this case differ from the present ? I can see none in principle. In the present case, Teachout was asked why he was there without counsel, and told that it was charged that his wife had been poisoned, and that he was the man that was going to be arrested for it; and by the coroner, upon his being called as a witness, that he had a right to refuse to testify; that there were rumors that his wife came to her death by foul means, and that some of those rumors implicated him. Surely this was conveying to him as strong a conviction that he was suspected of the murder as the arrest by the constable did to McMahon. McMahon was, in fact, arrested. Teachout was told that he was going to be arrested. Had the constable arrested McMahon upon any other charge, his testimony before the coroner would have been admissible. There was nothing in his office, or in the fact of the arrest, that would have excluded it. It was the charge against him, and knowledge thereof communicated by the arrest, that had that effect. But it is said that if Teachout, in the absence of promises or threats to induce it, but with full knowledge that

he was suspected of the crime, made a statement, without oath, similar to his testimony before the coroner, such statement would have been competent evidence against him upon his trial. This is true; and it is equally true that such statement, though made while in custody, upon a warrant issued upon the same charge, would have been admissible against him upon his trial. (*People* v. *Wentz*, 37 N. Y., 303, and cases cited in opinion.) If this be so, it is emphatically asked, why should the fact that it was made under the sanction of an oath exclude it? This leads to an inquiry into the soundness of the principle upon which *The People* v. *McMahon* was decided. That principle is, that a party accused of a crime and knowing of the accusation against him, is less reliable when sworn as a witness and giving testimony upon an inquiry as to the crime itself than he is in making a statement in relation to such crime, when left entirely free to state as much or little in relation thereto as he may choose. To remark upon such circumstances and in such order as he thinks proper; in short, to exercise an independent control over what and all he says, unembarrassed by the apparent authority of the officer before whom the examination is had, and by the almost exclusive control of the person conducting the examination, as to the order in which he shall testify, as to the facts and circumstances of the points to which he may speak, and the extent to which he may proceed thereon. Experience shows that statements without oath, made by innocent persons overwhelmed with an accusation of serious crime, require the closest scrutiny and care in their consideration. The books are full of admonitions from the wisest and best of judges in this respect. The cases are numerous where, under such circumstances, innocent persons resort to falsehoods, and often to those most absurd, with a view to shield them from the accusation. This motive to utter falsehood is so strong, that if there be added thereto threats to overawe or promises to excite hope, the confession is rendered incompetent, upon the ground that no safe reliance can be placed upon its truths. The ground upon which

McMahon's case was decided was, that calling a party before the officer administering the oath to him, his examination as a witness by other persons, while overwhelmed with the idea that everything he said or omitted to say, might have the consequence of extricating him from or of convicting him of the charge, would be as powerful an inducement to utter falsehood as any threats or promises made by a private person. I think, indeed, much more so. I should concur fully in the principle of McMahon's case, were it a question now here for the first time. I think the circumstances under which Teachout gave the testimony in question, were such, that no safe reliance could be placed upon it. If innocent, he knew he was accused and in imminent danger of a prosecution. The most powerful motive was presented to his mind to tell some *story*, whether true or false, to shield him from the charge. In this state he was called as a witness, and, upon presenting himself, was told by the coroner that he was suspected and might or might not testify, as he chooses. He is without counsel; and the reasoning most natural for him, in his excited state, was that if he refused to testify, every one would think it was because he could not on account of his guilt. I must therefore testify. He accordingly said, he was willing to tell all he knew. Would his situation, in respect to the reliability of his testimony, have been any different had the coroner told him upon his being called, it would be better for him to testify to all he knew. And yet, had this occurred, the testimony would have been clearly incompetent. Why? The answer of the counsel for the people might and probably would be, that the testimony was not voluntary. But why does the law exclude confessions not voluntarily made? The law is founded upon reason, and in its pursuit of truth never rejects any reliable means of attaining it. The humanity of the common law restrains a resort to torture or any coercive means to induce a confession; but the reason why it excludes a confession, if so obtained, without any of its agency, is not that it was so obtained, but because no reliance can be placed on it. That the party under such cir-

cumstances is quite as likely to state what is false as what is true. That this is the real reason for the exclusion will be more clearly seen when applied to a confession obtained by promises of favor. It cannot be claimed that the latter is excluded upon the ground that no one is bound to accuse himself. If this was the ground as to the latter, it would in its general application exclude every confession made by a party on trial. That reason had its origin in the aversion of the common law to torture, which was sanctioned by the civil law. It has nothing to do with the competency of a confession already made as evidence against the party making it. My conclusion is that the Oyer and Terminer erred in receiving the testimony in question, and that for that reason the judgment of that and of the Supreme Court affirming it, should be reversed and a new trial ordered.

HUNT, Ch. J., MASON, JAMES, MURRAY and DANIELS, JJ., concurred with WOODRUFF, J., for affirmance.

LOTT, J., was with GROVER, J., for reversal. He could not distinguish, on principle, the case from *People* v. *McMahon.*

Judgment affirmed.