Baldwin, J.
Otto Leuth having been indicted in four counts for the murder of Maggie Thompson, on the 9th day of May, 1889, was acquitted on the first, second and fourth counts, but was convicted on the third by the verdict of a jury and the judgment of the court of common pleas. In that count it was charged, in substance, that on that day and year, and in Cuyahoga county, he unlawfully and forcibly assaulted the body of said Maggie Thompson with intent violently, forcibly, and against her will unlawfully to ravish and carnally know her ; that he attempted to ravish her then and there, and that with a hammer in his right hand, while engaged in an attempt to perpetrate a rape, beat, bruised and struck her upon the head with intent purposely to kill and murder her, giving to her upon her forehead two mortal wounds, etc., of which she instantly died ; “ and that the said Otto Leuth beat her, the said Maggie Thompson, in the manner and by the means aforesaid, unlawfully, purposely, and in the attempt to perpetrate a rape, did kill and murder contrary to the form of the statute in such case made and provided,” etc.
A motion for a new trial was made and overruled, in which the following reasons -were alleged for a new trial:
First — There was irregularity in the proceeding of said jury, by which said defendant was prevented from having a fair trial.
Second — There was misconduct on the part of said jury, after their empaneling, and before the rendition of said verdict.
Third — There was accident and surprise, which ordinary prudence could not have guarded against.
Fourth — Said verdict is not sustained by sufficient evidence, and is contrary to law.
Fifth — There is newly discovered evidence material for the defendant, which he could not, with reasonable diligence, have discovered and produced at said trial.
Sixth — There was error of law occurring at said trial.
*96 Seventh — The court erred in admitting evidence offered by the state, which was objected to by the defendant.
Eighth — The court erred in excluding evidence offered by the defendant.
Ninth — The court erred in refusing to charge the jury as requested by the defendant.
The errors alleged in the petition in error in this court, are :
1st. In the admission of evidence.
2d. In excluding evidence.
3d. In admitting in evidence the written confession, so-called.
4th. In admitting oral evidence of what said so called written confession contained.
5th. In overruling the motion for a new trial.
6th. In refusing to instruct the jury as requested by defendant.
No claim or showing was made in this court, nor, apparently, in the court of common pleas, under the first, second, third or fifth causes of error stated in the motion for a new trial.
The foremost and most important question in the case is the propriety of admitting a confession committed to writing by the Coroner, made on oath before him, and signed by the accused.
It reads as follows:
“Otto Leuth, being duly sworn, testifies as follows: Am sixteen years old, and live at 42 Merchant avenue. Right after my mother went to the hospital, I stopped work at Rauch & Lang’s. On Thursday, the 9th day of May, I was standing at our gate, when little Maggie Thompson came by and asked me for some buttons. This was about 11:30 A. M. I told her to come in the house. She came into the house and went up stairs writh me. When she came up stairs I struck her on the head with a hammer two or three times. After she fell I pulled her clothes off and put her on the bed and covered her up. I then w’ent out on the street, and came back again in *97 the afternoon. I left it in the bed nearly a week. Did not sleep in the house during this time. The following Wednesday I took it down cellar, with all its clothes, and wrapped it all in some old clothes; went to the cellar, and through the opening which communicated with the space between the cellar wall and the foundation, crawled after the body and shoved it to the place where it was found. I killed because I wanted to have connection with her. I tried after I had struck her, to have intercourse with her. The hammer I used had been up stairs for a long time; I think it came from the old country.
“(Signed), Otto Leuth.”
As required by law in Ohio (Rufer v. State, 25 Ohio St. 464), the defense assumed the burden of proving that the confession was inadmissible.
It was proved that the police was called to the home of Otto Leuth at about 9 o’clock in the evening of the 9th of June, 1889, the body having been just'found, traced by its smell. That Otto was then absent, but soon returned, and on telling who he was, was admitted.
That he was asked by the police, as he was small, to draw out the body, but refused, saying, as said some, “ What do you take me for?” or, as his mother said, “There are plenty of police.”
After the body was drawn out by the police and examined, and about 2 o’clock, Otto, his mother and father, and Mr. and Mrs. Shevel, who lived in the rear part of the house, were all taken together in the patrol wagon to the police station about a mile away. Otto was questioned by the police. He was cool in manner. Said that on the day Maggie Thompson was missed he was across the street from his home at the meat shop, and said he did not know her. He was asked about the smell; said he had pulled off some slats, lighted some matches, but could not see anything, and as to how the body got in the •cellar he replied, “ How should I know ?j” Mrs. Shevel was then examined. She related such circumstances as raised a *98 grave suspicion that Otto knew more of the matter than he had appeared to. Among other things it appeared that Otto had repeatedly with sulphur and chloride of lime tried to remove the smell; that he had crawled from the Leuth round cellar to that of the Shevel’s in the rear, and must have crawled over or very near the dead body; that he had carried out to the smoke house bed clothes which had. upon them a dark substance (probably the blood of the deceased), so corrupted as to be infested with worms.
Otto was then brought up the second time. He appeared’ at first cool, although afterward there was part of the time a twiching or v movement of the leg, and he appeared uneasy and nervous. The bed clothing testified to by Mrs. Shovel was brought in and thrown on the floor of the room. Otto’s attention was called to the spots, and-he was asked, “Look at this. What is this?” Otto replied that when he got home from Berea he got some beer and was drunk, and vomited on the bed, and soiled it in that way.
Lohrer testified that Hutchinson, the police officer, said : “ I guess that isn’t so; look at here,” pointing to one side. “ You might as well tell the truih about this.” Others said he was told “ You had better tell the truth.” Otto replied that that was all he could tell about it. One officer said to another, “That is clear enough.” No more was said, and he again went below.
Other witnesses were then examined, of whom Mr. Leuth was the last. While he was testifying there was an interruption by screams from Mrs. Leuth below, who was sitting in a chair in a hysterical condition. Otto, in his cell not far off, was excited and crying. He hollowed, “Oh, give me a revolver, I want to kill myself; I want to die;” and moved his hand sobbing.
The officer, Lohrer, asked, “ What is the matter, Otto ? ” He said “I did it; I did it.” The officer sajd “ Did what?” He replied “ I killed her.” The officer said “ Don’t carry on so; your mother is hero, and you will make her worse.” The *99 coroner then came in. Otto was nervous, moving about, crying and moaning. The coroner asked him if he had done it, and what with. Otto replied he had, and with a hammer. The coroner asked him if he was willing to make a statement under oath of that kind and subscribe his name to it, and Otto said “Certainly.” Lohrer said, “This is not a very good place, and you had better let him come out and go up stairs.” All then went up stairs. There Otto wanted the door closed, and his mother not be admitted. The coroner, before, he put him upon oath, told him he did not need to say anything that he did not wish to, or that would tend to injure or criminate him. The coronor then asked him to stand up, swore him, and asked him questions, putting in writing the answers, but not the questions. The coroner asked Otto if he would sign the statement. He said “ Yes*” and did so. It was not read to him, and although one witness says he glanced at it long enough to read it over, it seems, to say the least, doubtful if he did so.
Otto was considerably nervous, attending to questions, but at one time saying that he wanted to kill himself. He wanted to get out of the window, or tried to. The statement is signed, and is offered in evidence.
It is claimed that under substantially these facts the confession was not voluntary, and was inadmissible. The word “ voluntary,” as applied to life and its affairs, is used with wide latitude. We speak of a man’s being obliged by circumstances to an act which, nevertheless, we call voluntary, though much slighter motive through other instrumentality might make the act not voluntary.
Counsel for defense asked one witness if he had read Edwards on the Will. But in law, the word, as applied to, confession, or deed, or will, or other act, must receive that construction given to it by decision; that is, such meaning as is intended when it is said in those decisions that a confession must be voluntary. The case in tins state necessarily relied *100 upon by each side is Spears v. The State, 2 Ohio St. 583. Counsel for defense read the language of Judge Thurman, page 585.
“ The weight of authority establishes, as we think, the following propositions:
“ 1st. That before any confession can be received in evidence in a criminal case, it must be shown that it was voluntary. 1 Greenleaf Ev. 219.
“ 2nd. That a confession induced by hope or fear excited in the mind by the representations or threats of any one is not to be considered voluntary. The question in every case where a confession has followed representations or threats is, was it thus produced ? ”
1 The first rule is more exactly stated, for this state, in the syllabus: “ No confession can be received in evidence in a criminal case unless it was voluntary. For we have already said that in the 25th Ohio St. 464, the rule is laid down that the burden of showing .that a confession of guilt was obtained by improper inducements, l'ests with the defendant;” and Mc-Ilvaine, C. J., says, page 470:
. “ Whilst voluntary confessions are-always'admissible against a prisoner on trial, it is well settled that confessions of guilt made through the influence of hopes or fears induced by promises or threats of temporal benefit or disadvantage, are wholly inadmissible. There is no presumption of law, however, that such confessions are induced by improper representations made to the prisoner; but on the contrary, like every other act of the human hand or head, they are presumed to be voluntary until the contrary is shown. Hence, the burden of showing that such confessions were involuntary rests with the accused.” Under the rules thus laid down it is claimed by the defense that the statement made to Otto by Captain Hutchinson — “ That he had better tell the truth,” when on the second examination he said the spots on the bed clothes were caused by his vomiting from being drunk from beer, was a threat.
*101 There are a number of cases where that or very similar language has been discussed. That language has been held to make a confession inadmissible, but generally it has not.
It certainly was no promise, and it is not easy to see of what it was a threat. The reason of the rules in regard to confession is generally said to be the danger of untruth in the confession, unless those obtained by threats or.’ promises are excluded, and it seems not easy to see why a bare exhortation that it is better to tell the truth, should be an influence towards an untruth.
The matter is quite set at rest in this state by the case of Fouts v. State, 8 Ohio St. 98, where the fourth syllabus reads:
“ Testimony of the confession of the accused in a criminal presecution is not incompetent because the confession is made under advice that if he'was guilty the confession could not put him in any worse condition, and that he had better tell the truth at all time ;” and page, 108, Bartley, C. J., says:
“The weight of such testimony, when admitted, often depends on circumstantial corroboration. But the test of its incompetency appears to be the existence of reasonable grounds for presuming under the circumstance that the disclosure was made under the influence of some promise or threat of a temporal nature.”
• Counsel have drawn a moving picture of the condition and distress of the accused in charge of the officers of the law at night and much distressed, but those circumstances need not be discussed. These are no legal grounds of exclusion. Most confessions are made under similar circumstances, and the one just cited of Fouts v. State, was made to the officer in charge. See also Price v. State, 18 Ohio St. 419, where a fraud was practiced on the accused, but the confession was admitted, and Murphy v. State, 36 Ohio St. 628.
It is not to be supposed that any persen will make a confession of the crime of murder without emotion and distress. Another objection made to the confession; however, is that it was made nnder oath.
*102 The proceedings of the coroner were under and in pursuance of section 1221 of the Revised Statutes requiring that “ when information is given to any coroner that the body of a person, whose death is supposed to have been caused by violence, has been found within his county, he shall forthwith appear at the place where the body is, shall issue subpoenas for such witnesses as he deems necessary, and administer to them the usual oath, and proceed to inquire how the deceased came to his death; if by violence from any other person or persons, by whom, whether as principals or accessories before or after the fact, together with all the circumstances relating thereto; the testimony of the witness shall be reduced to writing, by them respectively subscribed, and with the finding and recognizances hereinafter mentioned, if any, shall be by the corouer returned to the clerk of .the court of common pleas of the county,” etc. Subpoenas were unnecessary, and none of the witnesses were then under any charge of crime. The authority relied upon by counsel for accused is 1 Greenleaf’s Evidence, sections 224, 225 and 226. “ The same rule that the confession must be voluntary, is .applied to cases where the prisoner has been examined before a magistrate, in the course of which examination the confession is made.” * * *
“The manner of examination is therefore particularly regarded, and if it appears that the prisoner has not been left wholly free, and did not consider himself to be so in what he was called upon to say, or did not feel himself at liberty wholly to decline any explanation or declaration whatever, the examination is not held to have been voluntary. In such cases, not only is the written eviidence rejected, but oral evidence will not be received, of what the prisoner said on that occasion. The prisoner, therefore, must not be sworn. Bull, N. P. 242; Hawk, P. C. B, 2 M. 46, section 3. * * *
“ Thus also, where several persons, among whom was the prisoner, were summoned before a committing magistrate upon an investigation touching a felony, there being at that time no specific charge against any person, and the prisoner being *103 sworn with the others, made a statement, and at the conclusion of the examination he was committed for trial; it was held. that the statement so made was not admissible against the prisoner, 6 C. and P. 161 per Gurney, B., H. C. and P. 250, 9 C. and P. 238.”
The only logical ground upon which such decisions could rest is when the witness is compelled to answer under oath, by fear amounting to threat of harm if he do not. In the case at bar, Otto had already confessed orally; was asked if he was willing to make the statement; said he was. Was cautioned that he need make none tending to injure or criminate himself. Was asked if he was willing to'bo sworn, and willing to sign the confession, to all of which he completely assented ; so that this confession does not seem to come within any reason for excluding sworn confessions.
Mr. Greenleaf, with some discussion of its wants of consistency, lays down the rule : Section 226, on the strength of old English cases or dicta only. Mr. Taylor, in his standard English work on Evidence, discusses, first, the impolicy and inconsistency of such a rule. Sections 895, 896 and 897, and in section 897, he says:
■“ And indeed the rule excluding sworn confessions seems strictly confined at common law to the case of a statement made by a party under oath while a prisoner under examination respecting a criminal charge. It is true that one or two decisions of Mr. Baron Gurney might be cited which seem to extend the rule somewhat farther and to render inadmissible confessions made on oaths to magistrates or coroners by parties who, after being examined as toitnesses, have themselves been committed for trial, but these decisions have been overruled by subsequent cases.” See the cases there cited, and also sections 898, 899 and 900 and. cases.
All the cases cited by Mr. Greenleaf are very thoroughly overruled.
The American authorities have generally followed the later rule laid down by Taylor. See 1 Wharton Am. Criminal Law, *104 sections 685 and 690; Wharton’s Criminal Evidence, section 644 and authorities.
We also have some authority in our own state. Bearing in mind that here the question is solely whether the fact that the confession is on oath makes it involuntary, the case of Jackson v. The State, 39 Ohio St. 39, is quite in point. The prisoner on examination before the examining magistrate offered himself as a witness, and was sworn. This examination was on trial offered against him, and was admitted. The court held the confession was competent under the rule stated'in Spears v. State, 2 Ohio St. 583.
The most important authority cited against the admission of statements made on oath at the coroner’s inquest is People v. McMahan, 15 N. Y. (16 Selden) 13; but it is itself overruled in Teachout v. People, 41 N. Y. 7, and in Murphy v. People, 63 N. Y. 590. See also 61 Am. Decisions, 730.
The confession in writing being admitted, objection was made to the introduction of the prior oral confession. While a confession at once reduced to writing is best proved by the writing, prior confessions are not merged in it as are negotiations in a written contract.
The quite complete confession, “I did it, I did it, I killed her,” made downstairs, first to an officer and after to the coroner, is a different confession from that afterwards taken upstairs and reduced to writing and signed, and evidence may be offered of as many confessions as are made.
The oral evidence of the conversation during the written confession was offered by the defendant first to the court, on the question whether the written confession should be admitted ; and second to the jury, to weaken, if he could, the force of that confession.
Several questions were made as to the proof of the corpus delicti.
In early days the corpus delicti in murder seems to have been the distinct proof of the death, “ either by direct evidence of the fact or by inspection of the body, a rule warranted by *105 melancholy experience of the conviction and execution of supposed offenders charged with the- murder of persons who survived their alleged murders.” 1 Starkie on Evidence, 575; Bouvier’s Law Dict., “Corpus Delicti” and authoritits cited.
The latter rule laid down, however, in Wharton’s Criminal Evidence, section 325, is: “ The corpus delicti, the proof of which is essential to sustain a conviction, consists of two things—
lsf. A criminal act.
2nd. The defendant’s agency in the production of such act.” And section 633 says: “ It should be remembered that the corpus delicti consists not merely of an objective crime, but of the defendant’s agency in the crime; and unless the corpus delicti in both these respects is proved, a confession is not by itself enough to sustain a conviction.” Such was the charge of the judge in the case at bar.
A judicial confession itself is sufficient to prove even the corpus delicti. But this confession in writing, though taken before the coroner, was not a judicial confession. (Wharton on Crim. Evidence, section 638, and Greenleaf on Ev., and Taylor on Ev. passim.)
In Blackburn v. State, 23 Ohio St. 164, it is said:
“ It is also objected that the court misdirected the jury as to the kind and amount of evidence necessary to prove the corpus delicti, or body of the crime. As Avé understand the charge of the court, it is in substance that extra-judicial confessions alone are not sufficient to prove the body of the crime, but that they may be taken and used for that purpose in connection with the other evidence of the cause. This we understand to be the law.”
It is good sense, and clearly results from this language, that the corpus delicti is not in all inspects to be proved by other evidence beyond a reasonable doubt — else no need to use the confession. Courts, however, have been quite solicitous as to the first matter, the old corpus delicti — that is, the certain *106 death by violence of the person charged to be murdered. In the case at bar, the body of Maggie Thompson was found beneath the premises occupied solely by Otto Leuth, in a place not accessible from outside.
It was beyond all possible doubt proved to be her body, and had at least three wounds, any one of which would have rendered her immediately unconscious and helpless. So she must have been killed. That she was no doubt killed in Otto’s bed-room appeared by the large amount of blood — a little on the bedstead, but very much more on the bed clothing and bed.
Otto said he killed her with a hammer, and put her in that bed. The hammer was fonnd there as stated.
It was impossible that, he did not know of the deed and the place of the corpse before and after its concealment. He had crawled close by or over it in a journey under the house to the cellar of the Shevels. He took the bed clothes out and afterwards assisted in cleaning them, there was such abundance of blood that there were many maggots. He lied to his mother, as well as to the coroner, as to the condition of the bed-clothes being the result of his drinking beer. His knowledge of his room, its contents, the corpse and its careful concealment by him must have been a guilty knowledge; and.it was proved by other evidence, as -well as by his confession, that from the time of the murder he slept out of the house. We have no doubt from this, to which other evidence was added, that there was sufficient proof as to the body of the crime, saving for discussion one further question.
It is claimed that in this case there were corpora delicti— two bodies of the crime, a claim arising from the count under which the conviction was had. Revised Statutes, sec. 6808, (murder, first degree), says:
“ Whoever purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating or attempting to perpetrate any rape, arson, robbery or burglary, *107 kills another, is guilty of murder in the first degree and shall suffer death.”
The accused was acquitted by the jury of having, of deliberate and premeditated malice, killed Maggie Thompson, but was convicted of having killed her in attempting to perpetrate a rape upon her.
It is claimed by the defense that there are in this conviction two crimes which are essential to the conviction, and the several bodies of which must be proved — first, of the murder, of which wo have already spoken; and second, of the attempt at rape.
To this several replies ai’e made:
1st. It is said that a bare attempt to commit a rape is not a crime in Ohio, a position that seems to be quite sustained by Fox v. State, 34 Ohio St. 377. There must be a success in crime, an assault or murder in connection with this attempt to bring it under the statutes of Ohio, there being in this State none but statutory crimes. *
2d. It is said that the one crime charged is murder, and there is proof of the death, by crime, of the victim and the agency of the accused, and to this claim we see no sufficient answer.
The body of the crime does not include the manner or details, nor above all any other crime, if any other has been committed.
In no reported case, we will venture, is the corpora delicti discussed.
But a still further and rather extraordinary claim is made by the counsel for accused. It is said that the only evidence that he designed to have connection with the body of Maggie Thompson in his confession; that that discloses only an intention to have connection with her dead body; that this is no crime under the laws of the state of Ohio, nor is it an attempt to perpetrate a rape, as that must be upon the body of a living person. *108 ¡^In this connection°it was claimed that any one of the blows that Maggie Thompson .received must have been instantly fatal.
In short, it is said that the jury found the accused guilty under the wrong count; that they should have found him guilty of killing her with “ deliberated and premeditated malice,” 'he having designed from the first'to kill’her for the purpose of connection with her dead body. We put no such dreadful construction on this confession. It says: “I killed her because I wanted to have connection with her; I tried to after I had struck her, to have connection with her.”
But the case is not without considerable other proof that the murder was in pursuance of an attempt at rape.
Every crime has a motive. There was no revenge or hope of gain in this crime. Unfortunately crimes where little girls suffer are too common not to leave a strong belief that the motive of this crime must have been improper relations with her. The evidence of the intention with which the crime was committed is strengthened by the fact that he had stripped her of her clothes, and her body was found in that condition.
•The confession is too brief to let us know the particulars of the crime. The victim, however, was only between seven and eight years old, and with no proof she is presumed not to have consented to an improper act. ' -O’Meara v. State, 17 Ohio St. 515. So that, with no express proof, force would be presumed. But force was used, and it seems to this court most probable that the force which killed her was used to stifle such outcry as might arouse the Shevelfs, occupying the rear of the same dwelling.
Even, in fact it is probable that she did not die instantly, with the first blow. Although that blow would have produced death, and probably instantly produced unconsciousness, it seems probable that there was for some time life, from the great amount of blood on the bed and bedclothing, indicating, according to the medical testimony, a continued circulation.
It seems, however, much more difficult to believe that the *109 accused, from the outset, purposely intended to and did murder her, with the intent of connection with her after she was dead than that he had improper purposes less strange which led to the crime of murder.
The crime, as claimed by the counsel for the accused, would be quite without a parallel, and improbable in a high degree.
The confession can bear no such construction as that claimed, that he enticed her into the house and struck her deliberately, intending from the first, and all through, that she should be entirely dead before he pursued his purpose.
The main defense made in this case is that of temporary insanity. Although'the counsel for defense expressly disclaim idiocy, insanity, dementia or amentia (page 956 of record), yet it is apparent that the real defense attempted is that Otto Leuth killed Maggie Thompson in a sudden fit of homicidal and uncontrollable frenzy, resulting from epilepsy. The leading case on that defense in this state is, and probably always will be, the charge to the jury by Judge Birchard, reported in Clark v. The State, 12 Ohio, 495. The court say :
“ The law presumes every person of the age of fourteen years to be of sufficient capacity to form the criminal purpose; to deliberate and premeditate upon the acts which malice, hatred, revenge, or other evil disposition, might impel him to perpetrate. To meet this legal presumption, which meets this defense of insanity at its threshold, the mental alienation relied upon by the accused, must be affirmatively established by positive or circumstantial proof. You must be satisfied from the evidence that the perverted condition of the faculties of the mind, indicated in the main"question which I have already stated as excusing from crime, did exist at the'time.” Loeffner v. State, 10 Ohio St. 599; Silvus v. State, 22 Ohio St. 90; Bond v. State, 23 Ohio St. 349; Bergin v. State, 31 Ohio St. 115. Accordingly, the defense in this ease did assume the burden of proving by a preponderance of the testimony, that Otto Leuth, at the time of the commission of the offense, was insane, at least temporarily. The’court continued :.
*110 “It is not sufficient, if the proof barely shows that such a state of mind was possible, nor is it sufficient if it merely shows .it to have been probable. The proof must be such as to overrule the legal presumption of sanity ; it must satisfy you that he was not sane. It would be unsafe to let loose upon society great offenders, upon mere theory, hypothesis or conjecture: a rule that would produce such a result would endanger the community by creating a means of escape from criminal justice which the artful and experienced would not fail to embrace.” This language is affirmed in Loeffner v. State, 10 Ohio St. 306, and in Bergin v. State, 31 Ohio St. 115.
The measure of insanity in the case quoted is as follow's:
“Was the accused a free agent, in forming the purpose to kill? Was he at the time capable of judging whether that act was right or wrong? And did he know at the time that it was an offense against the laws of God and man ?” Clark’s case, 12 Ohio, 494; and Blackburn v. State, 23 Ohio St. 165.
The evidence relied upon by the accused to show his irresponsibility for the crime, was that of his near relatives, designed to show hereditary taint and bad health in himself.
His mother testified first, and it is difficult to read her testimony without feeling that it is largely exaggerated in some particular’s. Her mother died at 72, having wholly or partially lost her mind for some years; in earlier life she had convulsions, lying down and unconscious.
One aunt of accused had, at 33, partial paralysis, and is called a somnambulist, though it does not appear that she was so, save on one occasion.
Another aunt was deformed in her back and chest.
An uncle, otherwise strong, had convulsions, and died at 50.
One of his cousins is weak-minded.
His mother, when young, was subject to attacks which by counsel for accused are invariably called convulsions. If the definition of‘“ convulsion ” in Webster’s Dictionary is correct, some, at least, which are described, are more like ordinary fainting fits, being free from muscular contractions and convul *111 sive movements. The mother was a woman of excitable temper, sometimes violent in anger and cruel in punishment. She knocked Otto down once with a chair leg, once struck him in the head with a poker, and once jammed his head against the door.
For four or five years she was under the care of a physician, who attributed her Condition to uterine trouble, but on a hypothetical question which went beyond the evidence, thought if all in the question were true she might have inherited a tendency to epilepsy.
According to the testimony of Mrs. Leuth, Otto, when seven weeks old, fell out of bed and for a year after was weak and subject to convulsions. When he was two years old he had scarlet fever and diptheria. Up to his fifth year his health wras pretty good; then he did not want to walk; his feet hurt; he had fever and head difficulty some, and would noteat. At times he would spring up in the night, was confused, and the next day would have hollow rings around his eyes and spots in his face. During the last three years his memory was poor. His mother found out the day before her examination that he was blind in one eye. In fact, it appears by other testimony, that he had strabismus — one eye was far-sighted, and he became in consequence somewhat cross-eyed.
The physicians found on examination that there was a tender spot on his head, which, when pressed upon, hurt him severely.
His mother says he had the nose-bleed once in Germany and three or four times in this country, at night, so that, in her words, his pillow was full, his shirt was full, and his quilt was full of blood. He had ’ sometimes severe headaches. Once when his sister-in-law chased the chickens contrary to his wishes he took a hatchet and told her if she did not stop he would kill her.
If I have seemed too minute in this testimony, it is because the defense seemed to rely upon this testimony to prove that Otto, in the attack on Maggie Thompson, was seized with a sudden and uncontrollable fit of maniacal homicidal epilepsy.
*112 The hypothetical questions put by the counsel for accused, to his expert, largely overstated his evidence, but on such statement the testimony of his experts did not support his claim. The family testimony would lead to the conclusion that Otto was not a bright boy, nor a strong one; that his education, inheritance and surroundings were not favorable to his best growth.
His teachers, however, testified that he was bright and had a good memory. There was no satisfactory evidence that he ever had epilepsy or an epileptic fit in his life, much less one of a violent homicidal character.
An expert asked about it, and an authority read by the counsel for accused, stated that in such a violent homicidal epileptic lit as he was claimed to have had, the victim did not remember what took place, nor was he actuated by apparent motives. Otto, in his crifne, did i’emember about it, and his motives are apparent; and the enticing the girl into the house and upstairs is not in accord with the sudden uncontrollable homicidal frenzy.
There was considerable testimony against that of the defense, and on the evidence the jury found for the state,— it seems to us rightly so. To give the testimony its full force, it created no more than a possibility that Otto might have had such an attak, while even probability is not enough. The preponderance of evidence should have been, under the case last quoted, in favor of such attack, or the jury should have found as they did. It seems to us quite improbable that the jury were Avrong.
That he was more likely to commit crime than others, is probable, and that was most skilfully used by his counsel, to gain sympathy if he could; but if inclination to crime is an excuse, there is an end to criminal law.
Our attention is called to many objections made by the defense to asking, or mainly refusing questions of evidence. Many of them were not excepted to, but that fact was, we think, no damage to the defense. Those excepted to are *113 too numerous and too week to discuss. The state and the court were cautious as to ruling against the defense. Some questions ruled out were quite out of order, the defense endeavoring to anticipate what was strictly defensive. Quite a number of exceptions were to the exclusion of hearsay.
Several objections were to the form of the questions put by counsel for defense, containing in their frame an argument, and apparently intended more to affect the jury by the form of the question than by the answer of the witness. “ The mode and tone of examination are necessarily subject to the discretion of the court trying the case.” 1 Wharton Ev. § 566; 1 Wall. 359; 17 Wall. 541; 11 Gray, 57; 14 Wend. 105; 32 Ala. 585; 18 Ark. 540. See also, Taylor on Ev. § 1399. Where the testimony aimed at was really desirable, counsel drew it out at once by a question in better form. Several exceptions were where counsel endeavored to prove facts in the sickness or history of individuals of the family by pure 'hearsay, upon the ground that it was “family history,” meaning, I suppose,tradition or reputation. The limits in Greenleaf, sections 103, 104 and 134, and other books, were already exceeded in what was admitted without objection. The substantial objections made by him to testimony have already been disposed of by the previous part of this opinion, save one which occurred at the very close of the case.
The charge was full, clear, fair, and favorably so to the defendant, and carefully guarding his position and rights. It seems to have been so regarded by counsel for the defense, as he took but one exception. He asked the court to charge as follows: “ I ask the court to say to the jury as matter of law, that the statement made in the alleged written confession, ‘ I killed her because I wanted to have connection with her/ uncorroborated by any proof that such was the fact, is inadmissible.” It is the province of the judge to pass upon the admissibility of testimony, and not for the jury, even under his direction. The effect and value of evidence is for the jury, under his direction. So that this was no place to make the *114 question of the admission of that evidence. The evidence in fact was properly admitted, beeause it formed a part of his confession in writing, and because there was other evidence that such was his motive.
The next and only other request was as to the effect of that evidence, as was given by the court to the jury, with such modification as was satisfactory to the defendant and not excepted to by him.
We have each given a very careful examination of several days to the record in this case, and are all of opinion that there is no error.
The judgment of the court of common pleas in this cause is therefore affirmed.
(Affirmed by Supreme Court without report; Bradbury, J., dissenting. June 17, 1890.)